COMMUNITY NUTRITION INSTITUTE
et al., Plaintiffs,

v.

Bob BERGLAND et al., Defendants.

NATIONAL SOFT DRINK
ASSOCIATION, Plaintiff,

v.

Robert BERGLAND et al., Defendants.

Civ. A. Nos. 80–0243, 80–1093.

United States District Court,
District of Columbia.

June 27, 1980.

David C. Vladeck, William B. Schultz, Washington, D. C., for plaintiffs in No. 80–0243; Myron G. Zeitz, Gary Jacobs, Washington, D. C., of counsel.

Lewis K. Wise, Catherine A. Ribnick, Dept. of Justice, Washington, D. C., Bonnie Lukin, Dept. of Agriculture, Washington, D. C., for defendants in both cases.

Eugene M. Pfeifer, Rockville, Md., for plaintiff in No. 80–1093.

## MEMORANDUM OPINION

GESELL, District Judge.

These consolidated cases involve review of a regulation [1] issued by the Secretary of Agriculture implementing the 1977 congressional amendment to the National School Lunch and Breakfast programs. By determining what foods are deemed non-nutritious and by prohibiting the sale of certain competing non-nutritious foods on school premises until after lunch, the Secretary's regulation has raised highly emotional responses. The various plaintiffs in these cases, having been unsuccessful in persuading the Secretary of their divergent points of view, now vent upon the Court their frustrations over the results of the regulatory process. Plaintiffs in Civil Action No. 80–0243, Community Nutrition Institute ("CNI") and others, criticize the regulation for not going far enough in several particular respects, while the National Soft Drink Association ("NSDA") seeks to enjoin all aspects of the proposed rule in Civil Action No. 80–1093.

Although the Court has scheduled all proceedings within minimum time limits, the issues only became ripe for decision 11 days before the regulation is scheduled to go into effect nationwide. Under these circumstances, the contentions of the parties raised by the Secretary's motion to dismiss,

---

1. 45 Fed.Reg. 6770–72 (Jan. 29, 1980) (to be codified in 21 C.F.R. §§ 210.2, 210.15b, 220.2, 220.12).

or, in the alternative, for summary judgment as to both cases, CNI's motion for summary judgment, and an application by NSDA for preliminary injunction, must be dealt with summarily. The Court has benefitted from the briefs and argument of able counsel on all sides.

For more than 30 years, Congress has recognized the desirability of providing school children with nutritious foods during the school day. Legislation to further this national health policy has included the authorization of grants-in-aid and the promotion of other cooperative efforts with the states.[2] It has long been recognized that foods sold in competition with the school lunch and school breakfast programs might impede the nutritional objectives of such programs, promote waste and confuse children as to the relative nutritional value of different foods.[3] In 1977, Congress authorized the Secretary of Agriculture to regulate the sale of such competitive foods. Pub.L.No.95–166, § 17; 91 Stat. 1345, [1977] U.S.Code Cong. & Admin.News p. 3517. In conferring this authority on the Secretary, Congress expected and intended that new affirmative steps would be taken to restrict access by school children to foods of low nutritional value. *See* S.Rep.No.277, 95th Cong., 1st Sess. 17 (1977); H.R.Rep.No. 708, 95th Cong., 1st Sess. 44, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 3555, 3573. The legislative debates convey an unmistakable concern that "junk foods," notably various types of candy bars, chewing gum and soft drinks, not be allowed to compete in participating schools. *E. g.*, 123 Cong.Reg. 21766 (Sen. McGovern), 21778 (Sen. Dole); 123 Cong.Rec. H11669 (daily ed. Oct. 27, 1977) (Rep. Perkins).

The Secretary issued the regulation here under attack after two years of thorough examination and analysis. He had the benefit of elaborate input from representatives of state government, school systems, parents, students, citizens-at-large, and the potentially affected industries, as well as assorted health and nutrition experts.[4] In testing the reasonableness of the regulation, the Court has reviewed some of the raw data available to the Secretary. Obvious administrative problems must be taken into account. Moreover, while remaining conscious of the need to protect children from nutritional harm, it is necessary to have in mind the evolving learning in the nutrition field and to avoid judgments that reflect excessive responses to partially known conditions.

The supporting preambles[5] are lucid and often persuasive. They reflect the exercise of judgment, a willingness to weigh alternatives, an appreciation of complexity inherent in the undertaking and an absence of preconception. The regulation is accompanied by explanations discussing with clarity and common sense many issues raised in the comments. Such supporting evidence reinforces the Court's overall view that the promulgation of the challenged regulation was done responsibly and rationally. In most instances, the claims of arbitrary and capricious action are wholly lacking in mer-

---

**2.** *See* National School Lunch Act of 1946, § 2, 42 U.S.C. § 1751 (1976); Child Nutrition Act of 1966, § 2, 42 U.S.C. § 1771 (1976).

**3.** *See, e. g.*, H.R.Rep.No.81, 91st Cong., 2nd Sess. 3, *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 3014, 3016; S.Rep.No.277, 95th Cong., 1st Sess. 17 (1977).

**4.** It is a humbling experience to examine the record of a major rulemaking such as this. The Secretary sent to chambers at the Court's request the entire proceedings, numbering some 15,000 pages. Dipping into the materials discloses the complexity of the issues, the wide public concern with the result, the limited scientific data available in many areas of nutrition, the practical difficulties confronting the Secretary as he implements his congressional mandate, the intensity of the various special interest groups concerned with nutrition, and the enormous interest that any governmental program affecting schools and children evokes. The record includes over 7,300 comments received during three public comment periods, comment analyses by the agency, transcripts and memoranda of meetings with outside individuals and groups, and over 60 studies addressed to food consumption patterns and health and nutritional status among children and adolescents.

**5.** 45 Fed.Reg. 6758–70 (Jan. 29, 1980); 44 Fed. Reg. 40,004–013 (July 6, 1979).

it. As the following discussion indicates, the great bulk of the regulation can proceed into effect and only slight adjustments appear necessary, in spite of the sweeping contentions advanced.

### Jurisdiction and Standing

■ At the outset, the Secretary contends that the Court lacks jurisdiction to review the regulation, because Congress intended his action to be purely discretionary. 5 U.S.C. § 701(a)(2) (1976). The Secretary was not, however, directed to proceed without guidance from Congress. Although the statute does not contain more than general language, it is apparent that agency expertise was to be exercised to meet declared purposes. Sale of nutritious foods, as sanctioned by the Secretary, was to be permitted. The Secretary was authorized to bar competing non-nutritious foods that did not make a sufficient contribution to children's dietary habits. Thus circumscribed, administrative discretion was far from complete, and in the absence of any indication in the statute suggesting nonreviewability it is clear that jurisdiction exists under the Administrative Procedure Act. *See Barlow v. Collins,* 397 U.S. 159, 165–67, 90 S.Ct. 832, 836–838, 25 L.Ed.2d 192 (1970).

■ The claim that plaintiff lacks standing to sue is equally without merit here. The Secretary argues that because the thrust of the statute is directed to the food eaten by school children, groups generally interested in nutrition and the soft drink manufacturers who face economic losses have only concerns or injuries that do not satisfy the zone of interest test. *See generally Barlow v. Collins, supra; Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The Court does not read the cases this narrowly. The applicable "zone" covers interests regulated as well as protected by the statute in question. *Association of Data Processing Serv. Orgs. v. Camp, supra,* 397 U.S. at 153, 90 S.Ct. at 829. Plaintiffs in No. 80–0243 include individuals, and organizations speaking for individuals, whose health and nutrition interests are affected by the Secretary's action. And surely an industry such as the soft drink manufacturers, directly regulated by the challenged rule, can be heard. Standing will be recognized.

### Overall Rationality of the Regulation

■ The competitive food regulation was promulgated under informal rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. § 553 (1976). It is established that such agency action deserves considerable deference when tested in the context of the rulemaking process. The regulation is to be set aside, wholly or in part, only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Where, as here, the interests at stake are not merely economic but include the health and well-being of children, thorough scrutiny of administrative action is both appropriate and desirable. *National Assn. of Farmworkers Orgs. v. Marshall,* 628 F.2d 604 (D.C. Cir. 1980); *Wellford v. Ruckelshaus,* 439 F.2d 598, 601 (D.C.Cir. 1971). But in assuring itself that full consideration has been given to all significant factors, the Court need not find that the administrator's choice was optimal. So long as the decision has a reasoned basis and support in the record, the Court may not substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

■ In this regard, it should be obvious that the Secretary need not answer each of the thousands of comments he received over a two-year period. *See Automotive Parts & Accessories Assn. v. Boyd,* 407 F.2d 330, 338 (D.C.Cir. 1968). Nor does every non-frivolous "substantive" inquiry merit a head-on response in the agency's general statement under 5 U.S.C. § 553(c). Instead, the Secretary is obligated to identify and comment on only major issues raised during the proceeding which are central to his ex-

ercise of regulatory discretion. Judgments as to what issues are vital and material also are susceptible to review under the arbitrary and capricious standard. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

■■■ The Secretary is claimed to have acted beyond his power and arbitrarily in both his choice of a substantive approach and his failure to address various criticisms and alternative proposals when announcing the regulation. Substantively, it is urged that the congressional purpose could best be achieved by affirmatively designating specified foods as qualified for use, rather than restricting the types of food that are made available. The statement of this objection almost alone defeats its force. Congress intended to authorize regulation only of non-nutritious foods. H.R.Rep.No.708, *supra* at 44. The nutrient density standard rationally furthers this goal by excluding certain food categories on the basis of a per calorie yardstick widely accepted in the scientific community. The choice of whether to proceed by approval or restriction was within the Secretary's sound discretion. The rule does not purport to prescribe the ideal meal, nor does it address the particulars of an overall balanced diet. This is entirely sensible given the limited congressional authorization and considerations of feasibility amply documented on the record. Incomplete scientific knowledge in the field, recognized variations in nutritional effects by age, sex, race, and geographic region, and the enormous administrative costs of formulating and updating a food endorsement system all support the agency's decision to proceed cautiously by separating out known non-nutritious categories while encouraging nutritious meal service.

■■ Further, it is not arbitrary for the agency to apply its nutrient density standard only to certain categories as an initial baseline approach. The Secretary recognized that a regulatory scheme having precautionary objectives and addressing unsettled areas of scientific inquiry must necessarily be somewhat imprecise. His choice of four classes of foods, based on broad and undisputed evidence of their minimal nutritional value, is a reasonable first step. The present refusal to expand restricted categories by prescribing limits for fat, sodium and sugar content of competitive foods, which is attacked by CNI, must be viewed in this light. Lack of a scientific consensus and inadequacy of existing data on these food components justify the more gradual approach adopted. The petition procedure, permitting both individual exceptions and categorical extensions of restricted foods, helps counteract acknowledged imperfections in the regulatory scheme. In his overall substantive approach, the Secretary has acted rationally.

■■ The alleged procedural failure to resolve various contentions raised by NSDA is no abuse of discretion. Many of the comments voiced by the industry are answered directly in the preamble statements. Others received an indirect response through reference to studies reasonably relied on by the agency. Admittedly, more could have been said. This, however, is not enough to make the general statements arbitrary. The preambles adequately address major issues in the proceeding, and identify agency responses.

■■ A critical concern urged by NSDA is the failure to demonstrate a clear causal relationship between restricted access to the identified food categories and either diminished plate waste or enhanced nutrition education. This concern is misplaced. Congress indicated clearly its definite belief that sale of non-nutritious foods in school contributes to plate waste and lack of participation in the child nutrition program. *E. g.*, S.Rep.No.277, *supra*, at 17. The prevalence of this belief among parents, teachers, nutritionists, and school administrators is well documented. Logic and common sense, as well as several studies in the record, suggest that irregular eating habits combined with ready access to junk foods adversely affect federal nutritional objectives. In this context, it is unnecessary to determine the overall weight of the evidence, or to prove with mathematical preci-

sion that plate waste will diminish or school lunch participation increase as a direct result of the rule. It is enough that Congress and the public expect such results to follow, and that available studies do not render their expectations unreasonable. To demand rigorous proof in this area would be unfair and unwise. *See Ethyl Corp. v. EPA, supra,* 541 F.2d at 28.

### Fortification and Saccharin

The regulation prohibits sale of soda water or carbonated beverages, water ices, chewing gum, and certain candies in competition with school meals on the ground that they lack minimal nutritional value. However, the Secretary expressly authorizes fortification of these prohibited foods. 45 Fed.Reg. 6771 (proposed 21 C.F.R. § 210.-15b(b)(1)). A recommended daily allowance for eight designated nutrients is stated, and by adding one such nutrient in the specified amount and filing a petition, an otherwise nonacceptable food in the classes indicated can be sold.

The Secretary in his general statement concludes that fortified snack foods should not be encouraged. He specifically discusses the risks associated with inappropriate fortification, including nutritional imbalance, toxicity, and confusion or deception among consumers. 45 Fed.Reg. 6765–67 (Jan. 29, 1980). The Food and Drug Administration ("FDA"), recognizing these problems and others, has promulgated guidelines which strongly discourage fortification of snack foods such as candies and carbonated beverages. 45 Fed.Reg. 6323 (Jan. 25, 1980). Several Congressmen adverted in highly critical terms to the prospect of fortified snack foods being available in schools. *E. g.,* 123 Cong.Rec. 21766 (Sen. McGovern); 21779 (Sen. Dole). The health risks associated with fortification are particularly acute when linked to the availability of soft drinks artificially sweetened with saccharin, a potential carcinogen in humans.

■ No statement justifying or defending fortification appears in the preambles. The various reasons stated by the Secretary for opposing fortified snack foods are strongly supported on this record by the scientific community. Although the agency claims that the petition procedure as written is not meant to encourage attempts to fortify, such encouragement is inevitable. Given the stated intent of the Secretary, the overwhelming weight of the evidence presented, and the expressions of congressional concern, permitting otherwise nonnutritious foods in the restricted categories to be fortified can only be viewed as irrational and arbitrary. Because exceptions may be granted due to factors other than fortification, the petition procedure survives. However, 21 C.F.R. § 210.15b(b)(1) must not be invoked to secure an exemption based on fortification for any food within the four identified categories.

■ CNI expressed concern that the regulation authorizes sale to children of products containing saccharin. The prospect of manufacturers being able to fortify saccharin soft drinks otherwise lacking in nutritional value so as to sell the product in schools was particularly alarming. Many children cannot read the statutorily required saccharin cancer warning; others would ignore it. The proof before the Secretary was strongly opposed to the sale of such products.

The Secretary failed to deal adequately with the problem. He placed reliance on the fact that FDA has not banned such products and ignored the congressionally mandated warning. But surely the legislative determination that saccharin is a cancer-causing agent and the established scientific fact that its effects on the bladder are cumulative are positive factors which necessitate greater concern on the part of the Secretary. It is difficult to see how a cancer-causing product should be approved as a solely nutritious food when saccharin itself has no nutritional value.

In any event, the record is incomplete. The Secretary must make further analysis of this aspect. Evidence at hand suggests that the vast majority of saccharin consumed by school-age children is contained in artificially sweetened soft drinks. Given

that this most glaring saccharin concern is alleviated by the regulation itself modified by the Court's prior ruling on fortification, this aspect of the rule will be allowed to go into effect. However, additional evidence is needed as to the existence and role in children's diet of acceptably nutritious products containing saccharin. On remand, the Secretary must justify, in health and nutrition terms, the continuing availability to school children of any competitive foods containing saccharin. His study must be completed and announced within one year from this date.

Consideration for the public interest cautions that the Court should not unnecessarily delay implementation of the regulation. After years of consideration, it becomes effective July 1, 1980, to be carried out commencing with the next school year. The extent of the harm caused by use of saccharin in foods that naturally meet acceptable nutrition density standards is unexplicated in the record. In balancing the several alternatives, it seems best to allow the regulation to have effect as to such foods pending development of more data and a further statement from the Secretary. The Court anticipates a prompt, thorough response to this problem.

### Time and Place Limitations

 It is claimed that the Secretary acted beyond his power and arbitrarily in restricting sales of minimally nutritious foods throughout the school and until the end of the last lunch period. NSDA urges that Congress intended to impose restrictions only in school cafeterias and only during meal hours.

The statute itself contains no precise time and place limitation. Regulations are authorized which would affect food available "in competition with" federally funded programs. 42 U.S.C. § 1779. Congressional debates concerning the 1977 amendment contain some references suggesting that individual legislators may have contemplated restrictions limited to the cafeteria itself. Legislative reports are, however, silent on the subject, and an early version of the amendment which referred specifically to time and place limitations was stricken.

The Court is unpersuaded that Congress had the narrow intent suggested. The clear purpose of the Act would be frustrated if foods identified as non-nutritious could be sold fifteen minutes before lunch or in vending machines located down a corridor from the cafeteria. The Court need not search the record. It is an obvious fact of life that school premises vary in size and design, that food is served at different times in different schools and sometimes in multiple or even overlapping shifts, and that a vending machine, no matter where located, can operate as a magnet for any child who inclines toward the non-nutritious. The time and place approach chosen by the Secretary was entirely reasonable and consistent with congressional objectives.

The Secretary has in the main performed an arduous task in a responsible manner. NSDA's motion for a preliminary injunction is denied in view of the insubstantial case on the merits. Broad support for the regulation from Congress and the public, and the lack of any showing of irreparable harm to NSDA, are further factors precluding injunctive relief, although their presence here is hardly essential.

CNI's motion for summary judgment is granted in part. On remand, the Secretary must conduct further study into the saccharin issue as indicated above. The petition procedure shall not be used to exempt fortified foods from any of the four restricted categories. In all other respects, the Secretary's motion for summary judgment is granted. Both cases are dismissed.