717 F.2d 874
 STATE OF SOUTH CAROLINA ex rel. Leslie E. TINDAL,
Commissioner of Agriculture; Steven W. Hamm, as South
Carolina Consumer Advocate; South Carolina Farm Bureau;
Frank Flowers; W. Charles McGinnis; Lawrence Weathers;
Suncoast Milk Producers Cooperative; Independent Dairy
Farmers Association, Inc.; Tampa Independent Dairy Farmers'
Association, Inc.; Upper Florida Milk Producers
Association; Georgia Milk Producers, Inc.; Coble Dairy
Products Cooperative, Inc.; Inter-State Milk Producers
Cooperative; Dairymen, Inc.; Associated Milk Producers,
Inc., Appellees,
v.
John R. BLOCK, Secretary of the United States Department of
Agriculture, United States Department of
Agriculture and Commodity Credit
Corporation, Appellants.
State of Minnesota, Amicus Curiae.
Pennsylvania Farmers Union, Amicus Curiae.
Dairy Farmer Distributors of America and Gustafson, Amicus Curiae.
State of New York and Upstate Milk Cooperatives, Inc., Amicus Curiae.
 Nos. 83-1426, 83-1511.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 12, 1983.
Decided Sept. 9, 1983.
 
 Douglas Letter, Washington, D.C. (Leonard Schaitman, Nicholas Zeppos, Sarah Greenberg, Appellate Staff, Civ. Div., Dept. of Justice, J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Henry Dargan McMaster, U.S. Atty., Columbia, S.C., on brief), for appellants.
 Morton Hollander, Washington, D.C., (D. Paul Alagia, Jr., Richard A. Gladstone, Sydney J. Butler, Paul S. Davidson, Barnett & Alagia, Washington, D.C., Donald M. Barnes, Salvatore A. Romano, Joyce L. Bartoo, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., T. Travis Medlock, Atty. Gen., Clifford O. Koon, Jr., Asst. Atty. Gen., Columbia, S.C., Russell H. Putnam, Jr., Charleston, S.C., Russell W. Templeton, Columbia, S.C., Hubert E. Long, Long, Bouknight, Nicholson & Davis, Lexington, S.C., Venable Vermont, Columbia, S.C., on brief), for appellees.
 Hubert H. Humphrey, III, Atty. Gen., Jon K. Murphy, Catharine F. Haukedahl, Sp. Asst. Attys. Gen., St. Paul, Minn., on brief, for amicus curiae.
 Before PHILLIPS, SPROUSE and ERVIN, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 John R. Block, the Secretary of the United States Department of Agriculture (the Secretary), appeals from the judgment of the district court enjoining him from implementing his decision to impose a 50-cent deduction on the proceeds of all milk sold commercially. The Secretary officially announced his decision by issuing a "notice of determination," which incorporated, among other things, regulations for implementing the decision.[1] This action was taken pursuant to a recent congressional amendment to section 201 of the Agriculture Act of 1949,[2] which generally established the present structure of the milk price support program. The purposes of the deduction, as described by both Congress and the Secretary, are to encourage dairy farmers to reduce milk production and to offset a portion of the cost of the milk price support program.[3] The Secretary is not required by law to impose the deduction, but is authorized by Congress to take that action in his discretion if he believes it will encourage a reduction in milk production. It is conceded that the deduction will reduce the gross income of farmers by approximately 4 percent.[4]
 
 
 2
 The State of South Carolina, several dairy farmers and a number of intervening agricultural groups (hereinafter collectively referred to as "dairy parties") filed this suit in district court alleging administrative law and constitutional violations, and seeking injunctive relief preventing implementation of the deduction program. Following an evidentiary hearing, the court found that the Secretary had violated the Administrative Procedure Act (APA) in its rulemaking proceedings.[5] It then issued a preliminary injunction on June 3, 1983, enjoining further collections of the deduction and ordering the return of all monies collected pursuant to the regulation.[6] We hold that the Secretary complied with the APA and that the legislation granting him discretion to act does not violate any provision of the Constitution, and vacate the district court's order.
 
 I.
 
 3
 Congress, in section 201 of the Agriculture Act, authorizes and directs the Secretary to support the price of milk. 7 U.S.C. Sec. 1446. The express purposes of the dairy price support legislation are "to assure an adequate supply of pure and wholesome milk to meet current needs, reflect changes in the cost of production, and assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs." Id. Sec. 1446(c). The Secretary is not authorized to pay direct subsidies to producers, but supports the price of milk by standing ready to purchase unlimited quantities of milk products at announced prices. Id.; 48 Fed.Reg. 11,253. The Commodity Credit Corporation (CCC), a federal corporate entity within the United States Department of Agriculture,[7] removes excess milk from the market through purchases of surplus butter, cheese, and nonfat dry milk. This program effectively creates a floor for the prices of the products purchased and, indirectly, a floor for the price of all milk and milk products.
 
 
 4
 In recent years, milk production has greatly exceeded consumer demand. In each of the past two dairy marketing years, the CCC purchased the equivalent of 10 percent of all milk produced in the United States. See 48 Fed.Reg. at 3766. This has created massive inventories of hundreds of millions of pounds each of butter, cheese, and dry milk, with current annual storage costs of around $50 million. In 1982, the federal government spent approximately $2.3 billion on the milk price support program.[8] Id. at 3785.
 
 
 5
 Congress, responding to the problems of milk overproduction and the increasing cost of the dairy support program,[9] enacted the amendment in issue as part of the Omnibus Budget Reconciliation Act of 1982[10] (the 1982 amendment). The amendment modifies the price support statute in three respects. First, it established the price at which milk shall be supported at not less than $13.10 per hundredweight during the period October 1, 1982, until September 30, 1984, and mandated that this price level be maintained at a comparable percentage of parity[11] for the fiscal year 1984.[12] Second, Congress authorized the 50-cent deduction challenged in this suit. That portion of the amendment provides:
 
 
 6
 Effective for the period beginning October 1, 1982, and ending September 30, 1985, the Secretary may provide for a deduction of 50 cents per hundredweight from the proceeds of sale of all milk marketed commercially by producers to be remitted to the Commodity Credit Corporation to offset a portion of the cost of the milk price support program. Authority for requiring such deductions shall not apply for any fiscal year for which the Secretary estimates that net price support purchases of milk or the products of milk would be less than 5 billion pounds milk equivalent.
 
 
 7
 7 U.S.C. Sec. 1446(d)(2). Third, Congress authorized the Secretary to impose an additional 50-cent deduction effective April 1, 1983, that would be refundable to producers who reduce their commercial marketings.[13]
 
 
 8
 The Secretary, on September 22, 1982, projected that for the fiscal year beginning October 1, 1982, the net price support purchases of milk products would be 12.6 billion pounds. The Secretary then published a "notice of determination" in the federal register establishing the price support level at $13.10 for fiscal year October 1, 1982, and imposing the first 50-cent deduction beginning on December 1, 1982. He also published a proposed procedure for implementing the deduction program, and invited public comments on "whether the dairy collection plan should be implemented in the manner set forth in this proposed rule...." 47 Fed.Reg. 42,112 (Sept. 24, 1982). The final rule detailing the collection plan was published on November 30, 1982, and was essentially the same as the proposed rule.
 
 
 9
 The plaintiffs in the district court challenged the Secretary's imposition of the deduction on two grounds: that the legislation was unconstitutional and that the Secretary did not comply with the Administrative Procedure Act in issuing the determination. The district court entered its first preliminary injunction against the deduction on January 11, 1983. The court, considering only the administrative law challenges, found that the Secretary failed to comply with the Administrative Procedure Act, and that his action imposing the deduction was therefore illegal. State of South Carolina v. Block, 558 F.Supp. 1004 (D.S.C.1983) (Block I ). The court specifically found, among other things, that: (1) the appellants' determination of September 24, 1982, constituted substantive rulemaking under the Administrative Procedure Act, 5 U.S.C. Sec. 551(4); (2) the 1982 amendment vested in the appellants the discretion to impose the 50-cent deduction, but did not require the imposition of the assessment; (3) the Secretary had acted to impose the assessment without complying with the notice and comment provisions of the Administrative Procedure Act; (4) dairy farmers would be irreparably harmed by the Secretary's action, while the government would not suffer undue harm due to issuance of an injunction; and (5) that issuance of a preliminary injunction was in the public interest. Id.
 
 
 10
 The Secretary did not appeal the January 11 district court order. Instead, he published another notice designed to remedy the notice and comment defects found by the district court.[14] 48 Fed.Reg. 3764 (Jan. 27, 1983). The notice included a "Summary of Preliminary Regulatory Impact Analysis" and an "Initial Regulatory Flexibility Impact Analysis." Id. at 3765-66. The notice further invited the submission of comments, and stated that the comments submitted in response to the September 24 "notice of determination"[15] would be considered in determining whether to impose the new deduction requirement. Id. at 3764. The Secretary allowed a 30-day period to receive comments,[16] and then published a final rule imposing the first 50-cents per hundredweight deduction, beginning on April 16, 1983, and extending through September, 1983. 48 Fed.Reg. 11,253 (March 17, 1983).[17] In its final determination, the Secretary responded to the public comments and provided a "Summary of Final Regulatory Impact Analysis." Id. at 1254-55.
 
 
 11
 The plaintiffs again challenged the program contending that the statutory amendment was unconstitutional, and contending that the Secretary's second attempt to implement the deduction also violated the Administrative Procedure Act. The district court again did not address the constitutional claims, stating that "the problems concerning administrative law are so grave that these alone resolve the case against defendants." Block II, slip op. at 13. The court essentially found that the Secretary's second action in promulgating the rule for the deduction was arbitrary and capricious in three critical respects: (1) the Secretary did not comply with his statutory responsibility under the Agricultural Act by failing to consider such factors as: the cost of production, returns to producers and the support prices of other commodities; (2) the Secretary had failed to consider important and relevant factors prerequisite to a reasoned decision such as: the impact on dairy farmers, the impact on the economy dependent on dairy farmers, and the regional impact of the program on dairy production; and (3) the Secretary violated the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. Sec. 553, by failing to fairly apprise interested parties of the issues involved in the proposed program, by failing meaningfully to consider important and substantive comments on the proposed action, and by failing to explain his decision adequately. The district court issued the preliminary injunction[18] against the Secretary involved in this appeal, but declined to grant permanent injunctive relief stating that "the matter is not yet ripe for final resolution." Block II, slip op. at 13.
 
 
 12
 The Secretary on appeal insists that he complied with the APA. The dairy parties, however, relying on the same three objections successfully raised below, argue that: he failed to consider factors required by the Agricultural Act,[19] that he failed to consider other factors which, although not specified by the Agricultural Act, were critically relevant to his decision, and third, that he violated the notice and comment requirements of the Administrative Procedure Act.
 
 
 13
 The dairy parties' contentions, however, are misplaced. Congress, in passing the controlling legislation, narrowly defined the factors which the Secretary must consider in exercising his discretion, and the record shows that the Secretary considered those factors. The record also reveals that he complied with the notice and comment requirements. His published notice clearly delineates the proposed rule and we feel he sufficiently considered the comments submitted in response to the notice.
 
 
 14
 Normally, we would not consider the constitutional arguments raised but not considered in the district court. The government contends, however, and we agree, that the record is fully developed and the constitutional questions are ripe for review. Since we feel that the answers to the constitutional questions are obvious, a remand for initial determination by the district court would be a needless burden on judicial resources. It would also impose needless delays in the final resolution of this matter, which is of crucial and immediate importance to dairy farmers and others in the industry, as well as the government.[20] We therefore hold that the legislation in issue[21] and the Secretary's action pursuant to it[22] are not violative of any provision of the constitution. We thus remand with instructions that the complaint be dismissed.
 
 II.
 
 15
 The critical provision of the Agriculture Act in this litigation is section 1446, which defines the price support level for several commodities, including milk. The basic price support scheme contained in that section has been in place since 1949. Prior to the 1982 amendments, section 1446, with regard to dairy products, merely authorized the Secretary to support the price of milk through purchases of milk and milk products at announced prices. The price support level, which has been periodically adjusted by Congress, generally has been expressed as a price above a specified minimum level or as falling within a certain range based on the parity price. The Secretary determines the precise support level for a particular year. One of the dairy parties' attacks is that the Secretary, in determining to impose the deduction vel non, must act upon the same economic considerations that he is required to consider in fixing the milk price support level. The factors which the Secretary must consider in fixing the support level are specifically contained in section 1446 and other provisions of the Agricultural Act. See, e.g., 7 U.S.C. Secs. 1421(b), 1446b.
 
 
 16
 Section 1446, as amended by the Omnibus Budget Reconciliation Act of 1982, provides in pertinent part:
 
 
 17
 The Secretary is authorized and directed to make available ... price support to producers for ... milk ... as follows:
 
 
 18
 ....
 
 
 19
 (c) The price of milk shall be supported at such level not in excess of 90 per centum nor less than 75 per centum of the parity price therefor as the Secretary determines necessary in order to assure an adequate supply of pure and wholesome milk to meet current needs, reflect changes in the cost of production, and assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs. Such price support shall be provided through the purchase of milk and products of milk.
 
 
 20
 (d) Notwithstanding any other provision of law--
 
 
 21
 (1)(A) Effective for the period beginning October 1, 1982, and ending September 30, 1984, the price of milk shall be supported at not less than $13.10 per hundredweight of milk containing 3.67 per centum milkfat.
 
 
 22
 ....
 
 
 23
 (C) The price of milk shall be supported through the purchase of milk and the products of milk.
 
 
 24
 (2) Effective for the period beginning October 1, 1982, and ending September 30, 1985, the Secretary may provide for a deduction of 50 cents per hundredweight from the proceeds of sale of all milk marketed commercially by producers to be remitted to the Commodity Credit Corporation to offset a portion of the cost of the milk price support program. Authority for requiring such deductions shall not apply for any fiscal year for which the Secretary estimates that net price support purchases of milk or the products of milk would be less than 5 billion pounds milk equivalent. If at any time during a fiscal year the Secretary should estimate that such net price support purchases during that fiscal year would be less than 5 billion pounds, the authority for requiring such deduction shall not apply for the balance of the year.
 
 
 25
 (3)(A) Effective for the period beginning April 1, 1983, and ending September 30, 1985, the Secretary may provide for a deduction of 50 cents per hundredweight, in addition to the deduction referred to in paragraph (2), from the proceeds of sale of all milk marketed commercially by producers to be remitted to the Corporation. The deduction authorized by this subparagraph shall be implemented only if the Secretary establishes a program whereby the funds resulting from such deductions would be refunded in the manner provided in this paragraph to producers who reduce their commercial marketings from such marketings during the base period.
 
 
 26
 To reiterate, Congress again, in this 1982 Omnibus amendment, adjusted the price support level, providing for a minimum level of $13.10 through September 30, 1984. Significantly, Congress departed from the historical approach it had pursued in this area of agricultural legislation. In the past, congressional action simply concerned fixing the price level at which milk products would be supported. In the 1982 amendment, the Secretary was given authority to require dairy farmers to deduct and remit to the Secretary fifty cents from the price they received for each hundredweight of milk. It is this discretion given the Secretary which is central to the issues in this appeal. That discretion to impose the 50-cent deduction is contingent on the Secretary's projection of milk purchases by the CCC exceeding a specified amount. 7 U.S.C. Sec. 1446(d)(2). Such authority was given to the Secretary for the period October 1, 1982, through September 30, 1985. Id. Congress never before under the dairy support program had authorized the Secretary to reduce the income of dairy farmers or to affect the price of milk except by fixing the price support level.A.
 
 
 27
 The dairy parties concede that Congress, by granting the Secretary authority to impose the 50-cent deduction, departed from the historical structure of the Agriculture Act. They nevertheless insist that all of the historical provisions of the Act apply to and control the Secretary's discretion in imposing the deduction. Specifically, they contend, and the district court held, that sections 1421(a), 1446(c), and 1446b describe "factors" which the Secretary must consider in exercising his discretion to impose the deduction vel non.[23] Section 1446(c) is quoted above. Section 1421(b) describes factors which the Secretary must consider in determining price support. It provides in part:
 
 
 28
 (b) Except as otherwise provided in this Act, the amounts, terms, and conditions of price support operations and the extent to which such operations are carried, shall be determined or approved by the Secretary. The following factors shall be taken into consideration in determining, ... in the case of any commodity for which price support is mandatory [such as milk], the level of support in excess of the minimum level prescribed for such commodity: (1) the supply of the commodity in relation to the demand therefor, (2) the price levels at which other commodities are being supported, ... (3) the availability of funds, (4) the perishability of the commodity, (5) the importance of the commodity to agriculture and the national economy, (6) the ability to dispose of stocks acquired through a price-support operation, (7) the need for offsetting temporary losses of export markets, (8) the ability and willingness of producers to keep supplies in line with demand....
 
 Section 1446b provides:
 
 29
 The production and use of abundant supplies of high quality milk and dairy products are essential to the health and general welfare of the Nation; a dependable domestic source of supply of these foods in the form of high grade dairy herds and modern, sanitary dairy equipment is important to the national defense; and an economically sound dairy industry affects beneficially the economy of the country as a whole. It is the policy of Congress to assume a stabilized annual production of adequate supplies of milk and dairy products; to promote the increased use of these essential foods; to improve the domestic source of supply of milk and butterfat by encouraging dairy farmers to develop efficient production units consisting of high-grade, disease-free cattle and modern sanitary equipment; and to stabilize the economy of dairy farmers at a level which will provide a fair return for their labor and investment when compared with the cost of things that farmers buy.
 
 
 30
 Contrary to the dairy parties' contentions, however, it seems clear that what Congress intended in enacting section 1446(d)(2) was a self-contained, temporary change in the dairy support program in response to the immediate problems of increasing overproduction and the burgeoning cost of the price support program. Congress prefaced section 1446(d) with the phrase "[n]otwithstanding any other provision of law." It then articulated in section 1446(d)(2) specific factors the Secretary must consider in deciding to impose the first 50-cent deduction: the overproduction of milk; the cost of the milk price support program; the expected amount of CCC purchases; and the relevant time periods. The legislative history shows that Congress considered the effects on the economy of imposing the 50-cent deduction, the government budgetary problems and the individualized hardships it would impose on dairy farmers. After considering these factors in hearings and debates, it provided the Secretary with a narrowly-defined discretionary authority to implement the deduction. The statutory parameters of his discretion were set forth in section 1446(d)(2), which provides that the Secretary has such authority for only three fiscal years, October 1, 1982 through September 30, 1985, that such authority applies only if the Secretary estimates that the CCC will purchase in excess of 5 billion pounds of milk products, and the proceeds must be "remitted to the CCC to offset a portion of the cost of the milk price support program." There is no indication that Congress intended for the Secretary to consider factors contained in other provisions of the Agriculture Act.
 
 
 31
 The substance of all the statutory provisions which the dairy parties would have the Secretary apply in exercising his discretion to impose the deduction was in place long before the 1982 amendment became law. Section 1421(b) specifically states that it applies to the Secretary's actions under the milk program only for purposes of "determining ... the level of support in excess of the minimum level prescribed for [milk]." Section 1446(c), in listing the factors to be considered by the Secretary, specifically states that they are to be considered in setting the price support level for milk. Section 1446b is entitled "Promotion of increased use of dairy products," a concern of little relevance to the purposes of section 1446(d)(2).[24] Indeed, most, if not all, of the factors listed in the above provisions were considered by Congress in enacting the deduction portion of the 1982 amendment. See Schweiker v. Gray Panthers, 453 U.S. 34, 50 n. 22, 101 S.Ct. 2633, 2643 n. 22, 69 L.Ed.2d 460 (1981).
 
 
 32
 We conclude that the statutory factors reflecting congressional policy contained in 7 U.S.C. Secs. 1421(b), 1446(c) and 1446b apply only to the Secretary's responsibility in fixing the price support level, not to his responsibility in determining whether to impose the deduction. On the contrary, Congress narrowly defined the factors he should consider in exercising this latter discretion: whether surplus milk production would exceed five billion pounds and whether this deduction program would lower the government milk support costs. The record reflects that the Secretary considered the statutory requirements imposed upon him by Congress. If statutory requirements are satisfied, a court cannot set aside an administrative decision simply because it "is unhappy with the result reached." Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).
 
 
 33
 The Secretary projected milk production and CCC purchases with and without imposition of the 50-cent deduction for fiscal year 1983 as shown in his "Summary of Final Regulatory Impact Analysis" as follows:
 
 
 34
 With price support at $13.10 per hundredweight, production is projected to be 138.6 billion pounds for fiscal year 1983 if there is no deduction program, up 3.6 billion pounds from fiscal year 1982. Relatively low feed prices, resulting from record crop production, will keep milk-feed price relationships favorable for increased production. Commercial consumption is projected to increase 1.9 billion pounds to 124.0 billion pounds, milk equivalent, because of relatively stable retail prices and increased population. It is estimated that CCC removals in fiscal year 1983 will be 14.7 billion pounds, up about 0.9 billion pounds or about 8.5 percent more than a year earlier. Despite the upward trend in consumption, purchases would continue to exceed dispositions and CCC stocks would continue to build--a condition that has existed since October 1979.
 
 
 35
 Even with implementation of a 50 cents per hundredweight deduction on April 16, 1983, milk production in fiscal year 1983 is likely to increase from the fiscal year 1982 level by 3.2 billion pounds. Implementation of a $1.00 per hundredweight deduction would result in production increasing by 2.8 billion pounds. Neither of the two deduction programs would have a great downward effect upon milk production this fiscal year because they would not become effective until the season of highest milk production has begun.
 
 
 36
 Net price support purchases during fiscal year 1983 are projected to be 14.3 billion pounds, at a cost of $2,375 million if a 50-cent per hundredweight deduction is imposed on April 16, 1983 and 13.9 billion pounds, at a cost of $2,314 million if the deduction is $1.00 per hundredweight. Net outlays before deductions, are projected to be $2,433 million with a 50-cent per hundredweight deduction and $2,372 million with a $1.00 per hundredweight deduction. During the period April 16, 1983, through September 30, 1983, a 50-cent per hundredweight deduction will likely total $324 million and $1.00 per hundredweight deduction will total $646 million. Therefore, net CCC outlays for the fiscal year, after deductions, are projected to be $2,109 million assuming a 50-cent deduction and $1,726 million assuming a $1.00 deduction. These figures compare with an estimated purchase cost of $2,282 million and a net outlay of $2,438 million for fiscal year 1982, and an estimated purchase cost of $2,438 and a net outlay of $2,496 million for fiscal year 1983 if there is no deduction.
 
 
 37
 48 Fed.Reg. at 11,254-55. The Secretary also determined that the 50-cent deduction would help to reduce the overproduction of milk, as shown in his "Initial Regulatory Flexibility Impact Analysis" as follows:
 
 
 38
 Failure to implement any deduction would fail to accomplish CCC's stated objectives and would result in a continuation of the present situation where milk production exceeds commercial consumption and Commodity Credit Corporation purchases large amounts of dairy products under the milk price support program at great expense.
 
 
 39
 Neither of the two deduction programs will have a great downward effect upon milk production during this fiscal year because they would not become effective until the season of highest milk productions (the flush) has begun. The effect upon milk production will begin to be felt after the flush in the summer months as pastures begin to deteriorate, and later in the fall when cows are taken off pasture and moved into barns.
 
 
 40
 48 Fed.Reg. at 3766.
 
 
 41
 Moreover, although the Secretary was required to consider only the three statutory factors, he in fact ranged over a broader spectrum of considerations in deciding to exercise his discretion to impose the 50-cent deduction. The Secretary's impact analysis is illustrative where he states:
 
 
 42
 The proposal will assure an adequate supply of milk and dairy products and will encourage efficient production units consisting of high-grade, disease-free cattle and modern sanitary equipment. It also will assure dairy farmers as a whole of a fair return for their labor and investment while assuring an adequate supply of pure and wholesome milk to meet current needs. The proposal will assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs. The proposal also reflects the recent reduction in the cost of feed and increased efficiency in production. Some marginal operators may not be able to profit under the proposal but the statute does not guarantee each and every dairy farmer a profit while requiring the accumulation of huge CCC stocks of surplus dairy products.
 
 
 43
 48 Fed.Reg. at 3765-66. See 7 U.S.C. Sec. 1446b.
 
 
 44
 We conclude, therefore, that the Secretary did not act in an arbitrary and capricious manner by failing to consider additional factors contained in other provisions of the Agriculture Act in implementing the 50-cent deduction. He not only considered the specific factors Congress legislatively required of him, but also considered other general policies underlying the national economy and the price support program.
 
 B.
 
 45
 The district court held that the Secretary was required by the Administrative Procedure Act not only to consider the legislative factors previously listed, but other general factors nowhere explicitly mentioned in the controlling legislation. 5 U.S.C. Sec. 706(2). It specifically found, among other things, that the Secretary improperly failed to consider in determining to impose the deduction: (1) the impact on dairy farmers; (2) the impact on the economy dependent on dairy farmers; (3) the regional impact on the dairy industry; and (4) the impact on milk production.
 
 
 46
 The district court fell into the same error in making these findings as it did in concluding that additional sections of the Agriculture Act must be considered. Again, Congress specifically, and we think emphatically, granted the Secretary discretion to decide whether to impose the deduction. It directed him to project whether CCC purchases would exceed 5 billion pounds and whether the deduction program would lower the cost to the government of the support program.[25] As already noted, the Secretary properly considered these factors. Courts are not free to add substantive or procedural hurdles for agencies to overcome if Congress has not established such requirements. See Baltimore Gas & Elec. Co. v. NRDC, --- U.S. ----, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Having met those requirements, it cannot be said that the Secretary's actions were arbitrary and capricious for failure to consider the factors which a court might feel are appropriate but which were either considered and rejected by Congress, or simply not included by Congress as factors which the administrative agency must consider.
 
 C.
 
 47
 The finding that the Secretary failed to comply with the notice and comment requirements of the APA, 5 U.S.C. Sec. 553, was also in error. The district court held first that the information made available to the public was critically deficient in that it did not reveal the information animating the defendant's proposal to a sufficient degree to allow effective public comment; second, that the Secretary did not adequately respond to comments; and third, that he failed adequately to explain his decision. We consider these district court findings in that sequential order.
 
 
 48
 First, section 553(b)(3) provides that a "notice" shall include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." The notice requirement is to fairly appraise interested parties of the issues involved in the rulemaking proceedings. Spartan Radiocasting Co. v. FCC, 619 F.2d 314, 321-22 (4th Cir.1980); Consolidation Coal Co. v. Costle, 604 F.2d 239, 248 (4th Cir.1979). Notice is sufficient if it affords interested parties a reasonable opportunity to participate in the rulemaking process. Forester v. Consumer Product Safety Comm'n, 559 F.2d 774, 787-88 (D.C.Cir.1977).
 
 
 49
 We believe the dairy parties and the interested public were fairly apprised of the "subjects and issues involved" regarding the Secretary's proposal to implement the 50-cent deduction. 5 U.S.C. Sec. 553(b)(3). The proposal explained the background of the proposed rule, described the milk price support program, and provided a summary of the proposed rule. It further discussed the expected effect of the regulation, the reasons for the action, the objectives and legal basis for the proposed rule, and a number of other considerations. The deduction program was designed by Congress itself following hearings and debate. Leaders in the dairy industry followed those congressional proceedings closely. As to them, the notice did not newly introduce the problem.
 
 
 50
 Second, the Secretary adequately responded to comments he had received after publishing the notice. The purpose of allowing comments is to permit an exchange of views, information, and criticism between interested persons and the agency. See Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). There is no requirement for the Secretary to discuss every fact or opinion contained in the public comments. General Telephone Co. v. United States, 449 F.2d 846, 862 (5th Cir.1971); Hiatt Grain & Feed, Inc. v. Bergland, 446 F.Supp. 457, 484 (D.Kan.1978), aff'd, 602 F.2d 929 (10th Cir.1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). Instead, the Secretary is obligated to identify and comment on only the relevant and significant issues raised during the proceeding. Home Box Office, 567 F.2d at 35 n. 58; Community Nutrition Institute v. Bergland, 493 F.Supp. 488, 492-93 (D.C.1980).
 
 
 51
 The Secretary enumerated all of the comments he had received with regard to the proposed deduction rules, and stated that "all comments bearing on the determination have been considered." 48 Fed.Reg. at 11,254. He responded specifically to a number of comments, such as ones stating that the deduction would not reduce milk production, that it would not balance supply and demand, that large numbers of small farmers would be put out of business, and other comments suggesting increased donations of dairy products, a reduction in the support price, termination of the milk price support program, and an exemption from the deduction for producer-handlers. Id. Most of the comments concerned alternatives to the deduction program outside the scope of the Secretary's authority, or concerned factors and issues irrelevant to implementation of the deduction or which had already been considered by Congress in enacting the deduction amendment. See Schweiker v. Gray Panthers, 453 U.S. 34, 50 n. 22, 101 S.Ct. 2633, 2643 n. 22, 69 L.Ed.2d 460 (1981). Having responded to the comments concerning the major factors relevant to a decision to implement the deduction and a number of others, the Secretary did not violate the comment requirement contained in 5 U.S.C. Sec. 553(c).
 
 
 52
 Third, the district court ruled that the Secretary's explanation of the final rule did not enable the court to discern the agency's reasoning, and thus frustrated judicial review. 5 U.S.C. Sec. 553(c). We feel that the Secretary adequately explained his decision to impose the first 50-cent deduction.
 
 
 53
 The APA does not require an exhaustive explanation of an administrator's reasoning for adopting a rule. Required is "a concise general statement [of the regulation's] basis and purpose." Appalachian Power Co. v. EPA, 579 F.2d 846, 854 (4th Cir.1978), quoting United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 758, 92 S.Ct. 1941, 1951, 32 L.Ed.2d 453 (1972). There is no obligation to make references in the agency explanation "to all the specific issues raised in comments." Appalachian Power Co., 579 F.2d at 854, quoting Kennecott Copper Corp. v. EPA, 462 F.2d 846, 850 (D.C.Cir.1972); Consumers Union of U.S., Inc. v. Consumer Product Safety Comm'n, 491 F.2d 810, 812 (2d Cir.1974). The agency's explanation must simply enable a reviewing court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did." General Telephone Co. v. United States, 449 F.2d 846, 862 (5th Cir.1971), quoting Automotive Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 338 (D.C.Cir.1968). See also Amoco Oil Co. v. EPA, 501 F.2d 722, 739 (D.C.Cir.1974).
 
 
 54
 The facts and policy concerns relied on by the Secretary are clearly set forth in the statement of basis and purpose in the final rule. In his "Summary of Final Regulatory Impact Analysis," the Secretary demonstrates that milk production is expected to increase; that CCC purchases will continue to increase despite a deduction program; and that without a deduction program, the CCC will have to spend accelerating amounts to support the price of dairy products. The Secretary also projected that CCC purchases would greatly exceed 5 billion pounds in fiscal year 1983, and that imposing the 50-cent deduction would reduce the amount the government would have to spend in that fiscal year. The Secretary thus articulated an adequate factual basis for his decision to impose a 50-cent deduction and clearly explained that decision.
 
 III.
 
 55
 The constitutional contentions merit little discussion. As we previously indicated, we normally would not entertain these issues since they were not considered by the district court and the resolution of the constitutional questions are not necessary to support our decision to reverse the action of the district court issuing the preliminary injunction. If we ruled solely on the district court's holding relating to violation of the APA, however, the constitutional issues surely would be raised again on remand with attendant delays of hearing and appeal. Since we have decided the administrative law issues adversely to the dairy parties, only their constitutional claims remain. No factual issues inhibit our full understanding of those claims, and the asserted constitutional principles are well settled. The development of those issues in district court would provide us with little assistance in disposing of the constitutional arguments. Therefore, with some hesitancy in departing from our well-established and trusted rule that we not meet constitutional problems unless necessary to the resolution of the appeal, we briefly consider the fully developed facts under well established principles of constitutional law.
 
 
 56
 The dairy parties first argue that the deduction, which is to be imposed by the Secretary, violates the constitutional provisions governing the taxing power. They specifically argue that it violates Art. I, Sec. 7, cl. 1, in that it is a tax not originating in the House of Representatives. They further argue that the deduction violates Art. I, Sec. 8, cl. 1, because Congress cannot delegate the "power to lay and collect taxes," and because the funds generated by the deduction do not go to the United States Treasury for the "general welfare."
 
 
 57
 The deduction, however, is not a tax. The mere fact a statute raises revenue does not imprint upon it the characteristics of a law by which the taxing power is exercised. Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884). The imposition of assessments have long been held to be a legitimate means of regulating commerce. See, e.g., Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). If regulation is the primary purpose of a statute, revenue raised under the statute will be considered a fee rather than a tax. United States v. Stangland, 242 F.2d 843, 848 (7th Cir.1957); Rodgers v. United States, 138 F.2d 992, 994 (6th Cir.1943).
 
 
 58
 The clear language and structure of the 1982 amendment indicates that its primary purpose is regulation. The statute's regulatory purpose is to reduce overproduction of milk and shift some of the financial burden of the price support program. Accordingly, the dairy amendment bears the indelible imprimatur of the commerce power and is not an unconstitutional exercise of the taxing power.
 
 
 59
 There likewise is no merit to the contention that the involved statute unconstitutionally delegates legislative power to the Secretary. The legislative history of section 1446(d)(2) reveals that Congress clearly delineated the policy objectives of reducing milk production and reducing the increasing cost of the milk price support program. The statute clearly describes the effective dates during which the deduction may be implemented, the specific amount of the deduction, and requires a minimum level of expected government purchases before the deduction can be imposed. Congress thus clearly delineated "the general policy, the public agency which will apply it, and the boundaries of the delegated authority." Electric Power & Light Corp. v. SEC, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946).
 
 
 60
 The dairy parties finally contend that section 1446(d)(2) is not a valid exercise under the commerce clause, Art. 1, Sec. 8, cl. 3. The test of this issue is simply stated by the Supreme Court ruling in Hodel v. Indiana, 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981): "A court may invalidate legislation under the commerce clause only if it is clear that there is no rational basis ... between the regulatory means selected and the asserted ends." Id. at 323-24, 101 S.Ct. at 2383. The dairy parties themselves are reaching for the irrational, contending that there exists no rational basis between the means--lowering the financial rate on milk--and the ends sought by Congress--a decrease in milk production and a contribution by milk suppliers to the cost of the support program. Indeed, the milk support program, which has been in effect for many years without challenge, is premised on the link between profitability and production.[26]
 
 IV.
 
 61
 We may well consider the tool given the Secretary to be blunt, and its use by the Secretary to effectively drive some producers "out-of-business" to be harsh as it applies to small dairy operations. It is clear, however, that Congress was aware of the possibility of harsh results to some small farmers. The Secretary, on appeal, admits that reduction to gross income by 4 percent will force some dairy families to cease their farming operations. The current unprecedented high expense of farming, the inherent cost inefficiency of operating a family farm, and the resulting small percentage of gross income ultimately realized as a profit, makes this sometimes cruel prospect a stark reality. Were we the Secretary, we might well have searched long for a more humane alternative, but our judicial task is not to substitute our judgment for that of the administrative agency. We are limited in our review to determining whether the Secretary acted constitutionally under a constitutional statute, followed the mandate of Congress, and in accordance with the APA.
 
 
 62
 The Secretary's actions implementing the 50-cent deduction authorized in section 1446(d)(2) were not, under our standard of review, arbitrary or capricious, nor in excess of statutory authority or limitations. 5 U.S.C. Sec. 706(2). We further hold that section 1446(d)(2) and its application withstand constitutional scrutiny. The order of the district court, therefore, is vacated and remanded for dismissal of the complaint.
 
 
 63
 VACATED AND REMANDED.
 
 
 
 [1]
 48 Fed.Reg. 11,253 (March 17, 1983). The deduction applies to the proceeds of milk sold during the period April 16, 1983, through September 30, 1983. Id. Collection procedures are set forth in the "final rule" published on November 30, 1983. 7 C.F.R. Sec. 1430.291 et seq. (1983). The party responsible for collecting the deduction may be the milk producer or purchaser, depending on the circumstances. To the extent a producer markets his own milk directly to consumers, he is responsible to remit to the Commodity Credit Corporation (CCC) 50 cents per hundredweight of milk sold. To the extent a producer sells his milk to non-consumers, the purchaser is responsible to deduct 50 cents per hundredweight of milk bought from the producer proceeds and remit the collections to the CCC. 7 U.S.C. Sec. 1446(d)(4); 7 C.F.R. Sec. 1430.295 (1983)
 
 
 [2]
 Pub.L. No. 97-253, Sec. 101, 96 Stat. 763 (Sept. 8, 1982) (amending 7 U.S.C. Sec. 1446)
 
 
 [3]
 See 7 U.S.C. Sec. 1446(d)(2); 48 Fed.Reg. 3764, 3766 (Jan. 27, 1983); see also note 9 infra
 
 
 [4]
 7 U.S.C. Sec. 1446(d)(2). Congress first provided in the amendment that the Secretary shall support the price of milk at not less than $13.10 per hundredweight, allowing the Secretary to increase that level in his discretion. Id. Sec. 1446(d)(1). The Secretary has set the price support level for the fiscal year October 1, 1982, through September 30, 1983, at the statutory minimum. 47 Fed.Reg. 42,128 (Sept. 24, 1982). The amendment further gave the Secretary discretion to impose two 50-cent deductions if CCC purchases of surplus milk products were projected to exceed certain levels. 7 U.S.C. Sec. 1446(d)(2), (3). The Secretary estimated that a 50-cent per hundredweight deduction represented about 4 percent of a farmer's gross income. 48 Fed.Reg. 3764, 3765 (Jan. 27, 1983). By imposing both deductions, the Secretary would reduce a farmer's income by about 8 percent. Id. The Secretary to date has imposed only one of the 50-cent deductions, which is the deduction challenged in this litigation
 
 
 [5]
 South Carolina v. Block, C/A No. 82-3172-0 (D.S.C. June 3, 1983) (Block II). The court, having found administrative law violations, did not address the constitutional claims
 District courts in several other circuits recently considered some of the same issues before the district court, and all refused to issue injunctions. Pennsylvania Farmers Union, Inc. v. Block, C/A No. 83-0476 (M.D.Pa. April 28, 1983); National Farmers' Organization, Inc. v. Block, 561 F.Supp. 1201 (E.D.Wis.1983); Mulroy v. Block, 569 F.Supp. 256 (N.D.N.Y.1983); Larsen v. Block, C/A No. NC-82-0222W (D.Utah March 28, 1983); Haworth v. Block, C/A No. 82-4187 (D.Idaho March 5, 1983).
 
 
 [6]
 The order was stayed by this court on June 13, 1983, pending appeal, and Chief Justice Burger, on June 27, 1983, denied a motion to dissolve the stay
 
 
 [7]
 This corporation is created in 15 U.S.C. Sec. 714
 
 
 [8]
 In 1982, the CCC purchased approximately 68 percent of all nonfat dry milk, 30 percent of all butter and 22 percent of all American cheese produced in this country. As of November 12, 1982, the CCC had inventories of over 400 million pounds of butter, 790 million pounds of cheese, and 1.2 billion pounds of nonfat dry milk. See National Farmers' Organization Inc. v. Block, 561 F.Supp. at 1203
 
 
 [9]
 See 7 U.S.C. Sec. 1446(d)(2) ("the Secretary may provide a deduction of 50 cents ... to offset a portion of the cost of the price support program."); H.R.Rep. No. 97-687, 97th Cong., 2d Sess. at 8 (1982) (the House Committee on Agriculture reported favorably on a program designed "to achieve supply adjustments by alleviating surpluses which, in the case of the dairy program, have resulted in excessive government costs"); S.Rep. No. 97-504, 97th Cong., 2d Sess. at 83-84, U.S.Code Cong. & Admin.News 1982, p. 1641
 
 
 [10]
 Pub.L. No. 97-253, Sec. 101, 96 Stat. 763. The Omnibus Budget Reconciliation Act of 1982 sought "to achieve ... dramatic reductions in Federal spending ... to wage an effective battle against Federal deficits." S.Rep. No. 97-504, 97th Cong., 2d Sess. at 4, U.S.Code Cong. & Admin.News 1982, p. 1643
 
 
 [11]
 See 7 U.S.C. Secs. 602, 608c(18), 1301(a)
 
 
 [12]
 7 U.S.C. Sec. 1446(d)(1)
 
 
 [13]
 Id. Sec. 1446(d)(3). This second deduction can be imposed only if estimated CCC purchases of milk products exceeds 7.5 billion pounds. While the Secretary has projected that CCC purchases will exceed that amount for fiscal year 1983, he has not yet imposed that deduction. This appeal concerns only the exercise by the Secretary of his discretion to impose the first deduction
 
 
 [14]
 The Secretary at this time estimated CCC purchases for fiscal year 1983 at 14.2 billion pounds
 
 
 [15]
 Some 25,000 comments were submitted, and a number of petitions were received containing 23,000 signatures. Virtually all comments were against the deduction
 
 
 [16]
 Approximately 5000 comments and petitions containing in excess of 500 signatures were received with regard to the second proposed determination
 
 
 [17]
 The final rule states that the deduction "is to be collected in accordance with the regulations published on November 30, 1982 (47 Fed.Reg. 53,831) [7 C.F.R. Sec. 1430.291 et seq. (1983) ]." 48 Fed.Reg. at 11,254
 
 
 [18]
 In support of its preliminary injunction, the district court further found that:
 (1) the plaintiffs have established a strong showing that, unless they are allowed injunctive relief by this court, they will suffer injuries of a sort which cannot be adequately compensated by a later return of the monies in question;
 (2) the defendants have failed to show that an injunction will cause them hardship of a level comparable to the harm that the plaintiffs will suffer if no injunction is issued;
 (3) the public interest strongly favors an injunction to prohibit the collection of this deduction.
 Block II, slip op. at 118. See Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir.1977).
 
 
 [19]
 See 7 U.S.C. Secs. 1421(b), 1446(c), 1446b
 
 
 [20]
 See Allstate Ins. Co. v. McNeill, 382 F.2d 84 (4th Cir.1967); Hurwitz v. Directors Guild, 364 F.2d 67 (2d Cir.), cert. denied, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966)
 
 
 [21]
 7 U.S.C. Sec. 1446(d)(2)
 
 
 [22]
 48 Fed.Reg. 11,253
 
 
 [23]
 The district court also held that 7 U.S.C. Sec. 1441a applied to the Secretary's determination to impose the deduction. That section, however, merely gives the Secretary the general duty to conduct ongoing studies on the cost of production of certain commodities. Id
 
 
 [24]
 In deciding to exercise his discretion, however, the Secretary did consider many of the factors listed in section 1446b. See 48 Fed.Reg. at 11,255
 
 
 [25]
 7 U.S.C. Sec. 1446(d)(2)
 
 
 [26]
 The dairy industry also alleged that section 1446(d)(2) as imposed violates the equal protection and due process requirements of the fifth amendment. These claims are clearly without merit. See Reed v. Reed, 404 U.S. 71, 75-76, 92 S.Ct. 251, 253-254, 30 L.Ed.2d 225 (1971); Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Larsen v. Block, C/A No. NC-82-0222W (D.Utah March 28, 1983)