791 F.2d 1136
 HLI LORDSHIP INDUSTRIES, INC., Appellant,
v.
The COMMITTEE FOR PURCHASE FROM THE BLIND AND OTHER SEVERELY
HANDICAPPED; Charles W. Fletcher; Secretary of Defense;
National Industries for the Severely Handicapped; National
Industries for the Blind, Appellees.
 No. 85-2263.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 3, 1986.
Decided June 4, 1986.
 
 Bingham Kennedy (Trilling & Kennedy on brief), for appellant.
 Joseph Luman (Luman, Schhor, Pearce & Rizo on brief), for appellee National Industries for the Severely Handicapped, Inc.
 David M. Glass, Dept. of Justice, Washington, D.C. (Richard K. Willard, Asst. Atty. Gen., Justin W. Williams, U.S. Atty., Alexandria, Va., Anthony J. Steinmeyer, Washington, D.C., on brief), for Federal appellees.
 Larry W. Thomas, Cameron, Hornbostel & Adelman, Washington, D.C., Paul M. Frank, Alexander & Green, New York City, on brief, for appellee Nat. Industries for the Blind.
 Before HARRISON L. WINTER, Chief Judge, and MURNAGHAN and ERVIN, Circuit Judges.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 HLI Lordship Industries, Inc. (Lordship) appeals from a judgment of the district court sustaining a decision of the Committee for Purchase From the Blind and Severely Handicapped (the Committee) allocating to Elwyn Industries (Elwyn) future procurement contracts for certain military medals which had previously been awarded to Lordship and others under a competitive bidding system. 615 F.Supp. 970. Because we conclude that the Committee in reaching its decision failed to comply with the rule-making procedures of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 553, as required by 41 U.S.C. Sec. 47(a)(2), we reverse and remand the case to the district court with directions to set aside the decision on that ground.
 
 I.
 
 2
 The Javits-Wagner-O'Day Act, 41 U.S.C. Secs. 46, et seq., established the Committee and authorized it to set aside commodities and services for procurement by the government from sheltered workshops for the blind and other severely handicapped. Once a commodity or service is placed on the procurement list, the various agencies of the federal government must procure that item or service from a qualified nonprofit agency rather than through competitive bidding. In formulating a procurement list and modifying it from time to time, the Committee is required to proceed by rule in compliance with 5 U.S.C. Sec. 553(b), (c), (d), and (e). Briefly stated, those provisions of APA require that notice of a proposed rule be given to interested persons, Sec. 553(b), that interested persons have the "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," Sec. 553(c), that the rule-making agency "[a]fter consideration of the relevant matter presented ... shall incorporate in the rules adopted a concise general statement of their basis and purpose," Sec. 553(c), that the rule adopted be published at least 30 days before it becomes effective, Sec. 553(d), and that the agency give interested persons "the right to petition for the issuance, amendment, or repeal of a rule," Sec. 553(e). Rules thus adopted are subject to judicial review, 5 U.S.C. Sec. 704, and the scope of review is defined by 5 U.S.C. Sec. 706, which, inter alia, directs a reviewing court to hold unlawful and set aside agency action found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] ... (D) without observance of procedure required by law ...."
 
 
 3
 A combination of the provisions of the statute and of the regulations, adopted under the authority conferred on the Committee by 41 U.S.C. Sec. 47(d)(1), establish a number of requirements for adding a commodity to the procurement list. The item proposed for addition must be "suitable" for procurement under the Act, 41 U.S.C. Sec. 47(a)(1) (1982), which is defined to require that a qualified workshop must be "capable of producing the commodity ... at a fair market price." 41 C.F.R. Sec. 51-2.6(a)(1) (1984). A qualified workshop must be a nonprofit agency for blind or other severely handicapped persons which, during the fiscal year, employs blind or other severely handicapped individuals for not less than 75% of the man-hours of direct labor required in the production of commodities or providing of services, whether or not procured under the Act. 41 U.S.C. Sec. 48b(3)(C), (4)(C) (1982). "Suitability" also includes a requirement that the workshop proposed to produce a commodity demonstrate that it will have "the capability to meet the Government's quality standards and delivery schedules by the time it assumes responsibility for supplying the Government under the Act." 41 C.F.R. Sec. 51-2.6(b) (1984). The Committee's regulations also require it to consider whether the addition of the commodity or service to the Procurement List will have a "serious adverse impact on the current or most recent contractor for the commodity or service." 41 C.F.R. Sec. 51-2.6(a)(2) (1984). In assessing the impact on the current or most recent contractor, the Committee gives "particular attention" to the "possible impact on that contractor's sales ...." 41 C.F.R. Sec. 51-2.6(d)(1) (1984). Finally, since the primary objective of the Act is to provide employment opportunities for blind and severely handicapped workers, the Committee has acknowledged its "responsibility for assuring that the approval of the addition of a commodity ... to the Procurement List will result in the provision of employment opportunities primarily for blind and other severely handicapped persons." Committee's Addition, Memo No. 10, p. 1 (September 17, 1982).
 
 
 4
 On January 21, 1983, the Committee published in the Federal Register a proposal to add eight medals to the procurement list. Along with the other private contractors that had produced these medals for the government under contracts awarded through competitive bidding, Lordship responded with written comments in opposition to the proposal. A period of unexplained inaction on the part of the Committee ensued until October 14, 1983, when the Committee republished the identical proposal except for the deletion of one medal. Lordship and others submitted additional written comments in opposition to the proposal and requested an oral hearing.
 
 
 5
 It having been disclosed by this time that the Committee proposed to have the medals supplied noncompetitively by Elwyn, Lordship argued that Elwyn proposed to subcontract most of the manufacturing tasks to one of two commercial firms (one being in bankruptcy), that Elwyn had never produced a medal as prime contractor, and that therefore the reliability of the subcontractors and Elwyn should be investigated. Lordship also argued that the manufacturing steps that Elwyn proposed to subcontract comprised 70% of the labor required to produce the medal and that Elwyn's use of a subcontractor would thus violate a requirement of the statute that 75% of the work be performed by the blind or severely handicapped. It also pointed out that Lordship subcontracted part of its work to handicapped persons at a psychiatric center and a veteran's hospital, and that loss of its contract would reduce Lordship's sales and ability to subcontract to handicapped workers, so that procurement from Elwyn would provide only negligible gains in handicapped employment. Lordship further argued that if Elwyn's proposed subcontractors maintained their existing price structure, Elwyn's prices to the government would of necessity be higher than commercial prices. Finally, Lordship contended that the Elwyn proposal would impose on it a substantial adverse financial impact such that Lordship would be required to discharge employees.
 
 
 6
 Lordship and another protester were given the opportunity to present oral arguments to the Committee on December 8, 1983, but only five of the Committee's fourteen members were present. Moreover, a week before the December meeting the Committee's Executive Director had circulated a vote sheet on the proposal to all members of the Committee. He did suggest that members not vote until after the December 8 meeting. It is conceded that the members had no discussion or communication among themselves except for those who attended the December 8 meeting. Nonetheless the members of the Committee were again requested to vote on December 19, and they were or had been furnished copies of the written protests along with a summary of comments by the Commission's staff.
 
 
 7
 Ultimately, the Committee voted eleven to two to adopt the proposal, the fourteenth member voting to add only 50% of the government's requirements to the Procurement List. The Committee's action was published in the Federal Register, and its entire explanation of its decision follows:
 
 
 8
 After consideration of the relevant matter presented, the Committee has determined that the commodities listed below are suitable for procurement by the Federal Government under 41 U.S.C. 46-48c, 85 Stat. 77.
 
 
 9
 I certify that the following actions will not have a significant impact on a substantial number of small entities. The major factors considered were:
 
 
 10
 a. The actions will not result in any additional reporting, recordkeeping or other compliance requirements.
 
 
 11
 b. The actions will have [sic] a serious economic impact on any contractors for the commodities listed.
 
 
 12
 c. The actions will result in authorizing small entities to produce commodities procured by the Government.
 
 
 13
 Accordingly, the following commodities are hereby added to the Procurement List 1984:
 
 
 14
 * * *
 
 
 15
 Thereafter Elwyn was awarded contracts for medals having a purchase price in excess of $1.4 million. Moreover, in 1984 the Committee staff published in the Federal Register a proposal to add six more medals to the Procurement List, but the proposal has not been acted on.
 
 II.
 
 16
 The district court sustained the Committee's decision essentially on the basis that there were facts before the Committee from which it could conclude that the Committee may have acted neither arbitrarily nor capriciously. For purposes of this appeal, we may concede that this is a correct summary of the record. Nonetheless the Committee was under a statutory duty to provide "a concise general statement" of the basis and purpose of its decision, and, as we see it, this the Committee failed to do. We therefore view it our duty to set aside the Committee's decision because its failure to fulfill its statutory obligation makes it impossible for us to provide effective appellate review.
 
 
 17
 The standard for evaluating the adequacy of an agency's explanation of the exercise of its rule-making authority was set forth by us in State of South Carolina ex rel. Tindal v. Block, 717 F.2d 874, 886 (4 Cir.1983), cert. denied, 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984), where we said:
 
 
 18
 The APA does not require an exhaustive explanation of an administrator's reasoning for adopting a rule. Required is 'a concise general statement [of the regulation's] basis and purpose.' [citations omitted] There is no obligation to make references in the agency explanation 'to all the specific issues raised in comments.' [citations omitted] The agency's explanation must simply enable a reviewing court 'to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did.' General Telephone Co. v. United States, 449 F.2d 846, 862 (5 Cir.1971), quoting Automotive Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 338 (D.C.Cir.1968).
 
 
 19
 In Automotive Parts, 407 F.2d at 338, on which we relied, the D.C. Circuit found it appropriate:
 
 
 20
 on the occasion of this first challenge to the implementation of [a] new statute ... to remind the Administrator of the ever present possibility of judicial review, and to caution against an overly literal reading of the statutory terms 'concise' and 'general.' These adjectives must be accommodated to the realities of judicial scrutiny, which do not contemplate that the court itself will, by a laborious examination of the record, formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution.
 
 
 21
 The views expressed by us in Tindal and by the District of Columbia Circuit in Automotive Parts are fully in accord with the Supreme Court's statements in Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) that an "agency must examine the relevant data and articulate a satisfactory explanation for its actions," and that courts "may not supply a reasoned basis for the agency's action that the agency itself has not given," though courts will " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " Id. at 33, 103 S.Ct. at 2861-62 (quoting Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)).
 
 
 22
 The Committee argues "as a threshold matter" that because Lordship does not challenge on appeal the substance of the procurement decision, the Committee cannot have violated Sec. 706(2)(A) by being "arbitrary and capricious." In particular, the Committee relies on the district court's finding that "[t]he Committee's interpretation of the term 'qualified nonprofit agency' is neither arbitrary nor capricious." This argument, however, completely ignores the additional requirement of Sec. 706(2)(D) that agency decisions be made in "observance of procedure required by law." The "concise general statement" mandated by Sec. 553(c), and other procedural requirements, are preconditions to the highly deferential "arbitrary and capricious" standard of review. We defer to agency expertise in interpreting the meaning of "qualified nonprofit agency," or any other regulatory term, only when the agency demonstrates in "a concise general statement" that it considered the major policy issues and applied its expertise in resolving them. Finally, even if the adequacy of an explanation is to be judged by the arbitrary and capricious standard, the district court never ruled on many of Lordship's arguments to which the Committee never specifically responded.
 
 
 23
 In turning to the arguments advanced by Lordship, the Committee contends that its "path may reasonably be discerned" from the published explanation. At the risk of redundancy, we reiterate Lordship's arguments in opposition to the proposal: (1) that there was reason to doubt that Elwyn, the designated handicap workshop, was capable of producing the commodity at all or at a fair market price (as required by 41 C.F.R. Sec. 51-2.6(a)(1)) because it had no prime contracting experience and it intended to subcontract out most of the manufacturing tasks to two firms, one of which was in bankruptcy; (2) that the proposal might not increase employment opportunities for the handicapped because much of Elwyn's work would be done by subcontractors while at the same time Lordship and other private contractors would have less work available for handicapped workers with whom they currently subcontracted (a relevant consideration under 41 C.F.R. Sec. 51-1.1(a)); (3) that because Elwyn would subcontract out the manufacturing work, the proposal violated the Act's requirements that handicapped workers provide 75% of the labor required for the commodities in issue, (41 U.S.C. Sec. 48b(3)(C), (4)(C)); and (4) that the proposal would have a serious economic impact on Lordship (a relevant consideration under 41 C.F.R. Sec. 51-2.6(d)(1)), as the medals in issue constituted 10% of Lordship's sales in recent years. Excluding the parts of the Committee's published explanation admittedly not relevant to the above concerns, the Committee's response to these non-frivolous arguments was:
 
 
 24
 After consideration of the relevant matter presented, the Committee has determined that the commodities listed below are suitable for procurement by the Federal Government under 41 U.S.C. 46-48c, 85 Stat. 77.
 
 
 25
 ... The major factors considered were:
 
 
 26
 * * *
 
 
 27
 b. The actions will [not] have a serious economic impact on any contractors for the commodities listed.*
 
 
 28
 * * *
 
 
 29
 We think it obvious that the Committee's response was far less than "a concise general statement" of the basis of its decision. It is literally no response. By stating flatly that the listed medals were "suitable for procurement," the Committee failed to articulate "what major issues of policy were ventilated by the informal proceedings," Block, 717 F.2d at 886 (quoting Automotive Parts, 407 F.2d at 338), despite the fact that Lordship and others raised numerous objections relevant to that decision. The Committee did respond to Lordship's claim of economic hardship by concluding that "[t]he actions will [not] have a serious economic impact on any contractors for the commodities listed." But this cryptic and perfunctory statement, no more than the Committee's silence as to the other issues, hardly explains "why the agency reacted to [the claim of economic hardship] the way it did." Block, 717 F.2d at 886 (emphasis added) (quoting Automotive Parts, 407 F.2d at 338). Though "[t]he APA does not require an exhaustive explanation of an administrator's reasoning," Block, 717 F.2d at 886, nor a review of every objection raised to a proposed action, the present explanation provides no evidence that the Committee even "examine[d] the relevant data," State Farm, 463 U.S. at 33, 103 S.Ct. at 2861-62, and would require this court to "formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution." Automotive Parts, 407 F.2d at 338.
 
 
 30
 All that we can determine on this record is that the Commission acted in violation of its statutory duty to articulate some basis for its decision. Because of this infraction, its decision must on remand be set aside.
 
 
 31
 REVERSED AND REMANDED.
 
 
 
 *
 Although "not" was excluded from the published notice, the context indicates that it should be present, especially since the Committee has used identical language including the "not" in explanations of previous decisions