CREDIT UNION NATIONAL
ASSOCIATION, et al.,
Plaintiffs,

v.

NATIONAL CREDIT UNION
ADMINISTRATION,
Defendant.

and

National Association of State Credit
Union Supervisors, et al.,
Plaintiffs,

v.

National Credit Union Administration,
Defendant.

Nos. Civ.A. 95–164–A, Civ.A. 95–263–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 25, 1995.

**296**

Teresa Ann Burke, Bingham, Dana & Gould, LLP, Washington, DC, for Credit Union National Association, Inc., Corporate Credit Union of Arizona, Georgia Central Credit Union, Missouri Credit Union League, Missouri League Corporate Credit Union, Virginia League Corporate Federal Credit Union, County Catholic Credit Union, Ronald La Mascus, R.C. Robertson, Earl J. Ogolin, plaintiffs.

Kathryn Davis Ray, Washington, DC, Jeri K. Somers, U.S. Attorney's Office, Alexandria, VA, for National Credit Union Administration, defendant.

## MEMORANDUM OPINION

HILTON, Chief Judge.

This matter came before the Court on cross motions for summary judgment. Plaintiffs in both of these actions, now consolidated before this Court, seek to overturn regulations recently promulgated by the National Credit Union Administration ("NCUA"), the agency charged with supervising the federal credit union system and the National Credit Union Share Insurance Fund. The Final Rule was issued by the NCUA on November 17, 1994, 59 Fed.Reg. 59,357, modifying 12 C.F.R. Part 704, which regulates state-chartered corporate credit unions in matters of governance, election procedures, field of membership and admission of members. The Plaintiffs argue that the NCUA has exceeded the scope of its statutory powers and has violated the Administrative Procedure Act ("APA") in promulgating these regulations. All parties agree that there are no material facts in dispute and this action is ripe for summary judgment.

The credit union system is a labyrinth of financial institutions and cooperatives as well as administrative and regulatory agencies on both the state and federal levels. The first credit unions were organized under state law, and are governed by state regulations. In 1934, Congress enacted the Federal Credit Union Act, ("FCUA") which authorized the creation of federally-chartered credit unions and created the NCUA to supervise those federally-chartered credit unions. In 1970, Congress amended the FCUA and established the National Credit Union Share Insurance Fund ("NCUSIF"), which is administered by the NCUA Board. 12 U.S.C. §§ 1781–1790c (1988). This fund provides insurance for accounts of federal credit unions for the first $100,000 per account, *Id.* §§ 1781(a), 1787(k), as well as accounts of state-chartered credit unions which elect to be covered. Each insured credit union pays and maintains with the NCUSIF a deposit in the amount of 1% of the credit union's insured shares. *Id.* § 1782(c)(1)(A)(i). The NCUSIF provides the Board with broad regulatory authority over all federally-insured credit unions, and grants the Board authority to review the applications of state-chartered credit unions. With this authority, the Board may:

> disapprove the application of any credit union for insurance of its member accounts if it finds that its reserves are inadequate, that its financial condition and policies are unsafe or unsound, that

its management is unfit, that insurance of its member accounts would otherwise involve undue risk to the fund, or that its powers and purposes are inconsistent with the promotion of thrift among its members and the creation of a source of credit for provident or productive purposes.

*Id.* § 1781(c)(2). In addition, the NCUA Board has the power to "prescribe such rules and regulations as it may deem necessary or appropriate to carry out the provisions" of the NCUSIF. *Id.* § 1789(a)(11).

As credit unions increased in number, credit union leagues were formed to cooperatively accomplish mutual goals. These unions are non-profit trade associations, representing the interests of their member credit unions. Members of the leagues' boards of directors are elected democratically by and from their member credit unions and are not compensated for their services. State credit union leagues belong to a national trade association, the Credit Union National Association ("CUNA"), which is a Plaintiff in this action. CUNA provides legislative, research, public relations, educational and other types of services to its members.

The credit unions have also formed "corporate" or "central" credit unions to provide investment expertise to their members and to share excess deposits among the credit union community. Corporates play a key role in the credit union system, providing their members with short-term investment opportunities, as well as loans and other forms of credit. *See* GAO Report at 2 (AR 2375). In turn, corporates invest funds in a single, large corporate credit union named U.S. Central. *Id.;* 59 Fed.Reg. at 18,504 (AR 2). As with credit unions, a dual state and federal chartering system exists for corporates. As of December 1994, excluding U.S. Central, there were forty-four corporates. Of these, eighteen hold federal charters, and twenty-one are state-chartered and federally-insured.[1]

The credit unions served by approximately one-half of the 43 corporate credit unions affiliated with CUNA have chosen democratically to have their corporates "integrated" with their state credit union leagues. Traditionally, this has resulted in a significant overlap of directors, a shared chief executive officer and other common management. As the plaintiffs point out, some corporates have realized significant cost savings by being integrated with credit union leagues. Indeed, some states specifically restrict the membership of corporate credit unions to credit unions that are members of the state credit union league. *See, e.g.,* Miss.Code Ann. § 81–13–13 (1993). Some state corporate credit union charters expressly require that each member be a member of the state credit union league (NASCUS Comp. ¶ 38) and some corporate credit union bylaws (which must be approved by the state credit union supervisor) designate their field of membership as all credit unions that are members of the state credit union league.

The crux of the dispute in this action is the NCUA's power to regulate integration between corporate credit union and state credit union leagues. On April 19, 1994, the NCUA issued an advance notice of proposed rulemaking seeking comments on whether to amend its regulations to reduce the close ties between corporates and credit union leagues. 59 Fed.Reg. 18,503 (AR 1). Specifically, the NCUA requested comment on whether to require that: (1) a corporate's board be independently elected; (2) a majority of directors represent member credit unions, and; (3) a majority of directors be individuals who do not serve as officials of trade associations. 59 Fed.Reg. at 18,505 (AR 3). The agency solicited further comments on how to structure elections so that credit unions enjoy majority representation on corporates' boards. *Id.* The NCUA cited its concern that the close relationship be-

---

**1.** The remaining five state-chartered corporates do not have federal insurance.

tween many corporates and trade associations creates "unavoidable conflicts of interest" as the reason for the proposed rulemaking. The NCUA stressed the importance of corporates to the health of the credit union system, pointing to the dramatic growth in assets of corporates and also citing cases of misuse of corporates' funds to advance the financial interests of leagues as reasons for the proposed rulemaking. The Board indicated its intent to apply the rule to non-federally-insured, state-chartered corporate credit unions as a condition of receiving deposits from natural person federal credit unions. 59 Fed. Reg. 18,506 (Rec.4.). Finally, the NCUA requested comments on whether it should require management of a corporate to report solely to the corporate's board. *Id.*

The NCUA received 400 comments in response to the advance notice of proposed rulemaking. Natural person credit unions who commented on the proposed changes opposed them by a margin of 2 to 1 (230 to 98), as did corporate credit union commentators (17 to 8). These opponents maintained that the structure of corporates was not a "safety and soundness" issue that should be subject to regulation. On September 23, 1994, the NCUA issued proposed regulations, which contained provisions similar to those described in the Advance Notice. 59 Fed.Reg. 48,832–38 (1994) (Rec.5–11).

The final rule proposes to change existing policy in several ways. The Plaintiffs in this action object to five of the changes. First, the rule proposes to regulate the field of membership of corporate credit unions by requiring that they "not condition the eligibility of any credit union to become a member on that credit union's membership in any other organization." 59 Fed.Reg. 59,358 (to be codified at 12 C.F.R. § 704.2). Second, the Rule requires federal election procedures for boards of directors of corporate credit unions and preempts election procedures specified by state law. 59 Fed.Reg. 59,358 (to be codified at 12 C.F.R. § 704.12(a)). Third, the

Rule specifically prohibits certain persons from serving on a corporate credit union board and restricts relationships with various credit unions and trade associations. 59 Fed.Reg. 59,358–59 (to be codified at 12 C.F.R. § 704.12(a)(2)). Fourth, the Rule imposes a federal recusal standard for voting procedures. 59 Fed.Reg. 59,359 (to be codified at 12 C.F.R. § 704.12(c)). Fifth, the Rule prohibits the corporate credit unions from employing a chief executive officer who is an employee of a credit union trade association. 59 Fed.Reg. 59,-359 (to be codified at 12 C.F.R. § 704.12(d)).

The Plaintiffs seek to have these regulations invalidated on the ground that the NCUA exceeded the power granted it by Congress. The Plaintiffs contend that the NCUA violated the dictates of the clear statement rule. Under that Rule, the Supreme Court has required that where Congress "intends to preempt the historic powers of the State," *Gregory v. Ashcroft,* 501 U.S. 452, 461, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), it must provide a "clear statement" of that intention. The Plaintiffs contend that the Rule at issue implicates the clear statement rule because it alters the traditional balance of federal and state powers concerning the supervision of state-chartered credit unions. The Plaintiffs state that the clear statement rule has been applied to invalidate regulatory rulemaking where, as here, there has been "an unauthorized assumption by an agency of major policy decisions properly made by Congress." *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Rel. Auth.,* 464 U.S. 89, 97, n. 7, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983).

The Plaintiffs argue that the NCUA, in promulgating this Rule, violated the clear statement rule because there is simply nothing in the Federal Credit Union Act ("FCUA") that gives the NCUA the authority to apply the Rule to state-chartered corporate credit unions traditionally under the supervision of state regulators. Congress has, however, provided the

NCUA with the power to issue such regulations "as it may deem necessary or appropriate" to administer the national insurance fund. 12 U.S.C. §§ 1766(a), 1789(a)(11).

■ The Supreme Court has squarely addressed the question of an agency's authority to issue regulations under a statute providing a broad grant of regulatory authority. The Court has stated that a regulation promulgated under an empowering statute stating "simply that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of the Act,' . . . will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publ. Serv.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) (*quoting Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969)); *Harman Mining Co. v. Director, Office of Workers Compensation Programs*, 826 F.2d 1388, 1390 (4th Cir.1987) ("We note the heavy burden on the [petitioner] to demonstrate the invalidity of a regulation promulgated under a statute providing a broad grant of regulatory authority").

■ The regulations at issue are clearly reasonably related to the purposes of the FCUA. The FCUA was intended to increase the average citizen's access to credit at affordable rates through development of a national credit union system. S.Rep. No. 555, 73d Cong., 2d Sess. at 1, 3 (1934). National share insurance was added in 1970 to (1) protect the accounts of individuals "who can least afford to sustain" a loss, and; (2) provide credit unions with the same insurance afforded to other federally-chartered financial institutions. H.R.Rep. No. 91–1457, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 4166, 4167–68. The Rule at issue is designed to protect the fiscal health of federally-insured credit unions by preventing conflicts of interest and the appearance of conflicts of interest. 59 Fed.Reg. at 18,505 (AR 3); 59 Fed.Reg. at 48,832–34 (AR 507); 59 Fed.Reg. at 59,358 (AR 13).

■ In addition, Plaintiffs contend that when Congress intended for the NCUA as administrator of the NCUSIF to have preemptive powers, it said so expressly, citing several sections in which Congress granted specific powers to the NCUA Board to preempt state law. However, as the Court recognized in *Mourning*, when Congress provides an administrative agency with broad powers to issue implementing regulations, as in the instant action, simply because the statute specifically authorizes some action does not mean that action not specifically authorized is invalid. *See Mourning*, 411 U.S. at 373, 93 S.Ct. 1652 ("Neither the sections of the Truth in Lending Act which refer specifically to transactions involving finance charges nor any other sections of the Act indicate that Congress attempted to list comprehensively all types of transactions to which the Board's regulations might apply.").

■ Plaintiffs have cited no provision of the FCUA indicating that the NCUA has exceeded its authority. The broad grant of power to the NCUA to promulgate regulations necessary to achieve the purposes of the statute belie any contention that Congress intended to specifically delineate the actions the NCUA might take to that end. As the Court in *Mourning* stated, "[t]o the contrary, [the Act's] broad grant of rulemaking authority reflects an intention to rely on those attributes of agency administration recognized in *American Trucking[ Assns. v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953) ]." *Id.* at 373, 93 S.Ct. 1652.

■ The Plaintiffs further argue that the Rule violates sections 1790a and 1786, which grants the NCUA power over directors of state-chartered credit unions only in limited instances and only on a case-by-case basis. This provision grants the NCUA the power to initiate cease and desist proceedings and to remove an offi-

cer or director found to have engaged in any unsafe or unsound practice.

The Plaintiffs fail to recognize, however, that the delegation of specific powers does not "eviscerate a general grant of rulemaking power." *In re Permanent Surface Mining Regulation Litigation*, 653 F.2d 514, 523 (D.C.Cir.), *cert. denied*, 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981); *see also Lincoln Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 856 F.2d 1558, 1562 (D.C.Cir.1988). Interpreting these provisions as the sole extent of the power of the NCUA in this area would render Congress' grant of power to prescribe implementing regulations meaningless. Furthermore, these Sections refer to very specific situations. Section 1790a requires newly chartered or troubled federally-insured credit unions to notify the NCUA of any change of a board member or senior executive officer. 12 U.S.C. § 1790a(a). The NCUA Board is required to disapprove the change if it finds that the individual's "competence, experience, character, or integrity" indicates that his or her employment is not in the best interests of the credit union or the public. 12 U.S.C. § 1790a(e). Section 1790a thus establishes a preapproval process that must be followed in certain narrowly circumscribed instances. The NASCUS plaintiffs have not pointed to any evidence that Congress, in enacting Section 1790a, intended that single provision to encompass all the NCUA's powers over matters of credit union governance.

Likewise, Section 1786, which gives the Board authority to issue cease and desist orders in specific instances where an officer or director is found to have engaged in any unsafe or unsound practice does not limit the Board's power to individual instances. As the Defendants' point out, the NASCUS Plaintiffs' theory is flawed because under that theory the agency would be limited to taking action against particular institutions or individuals after problems had developed, never allowing the agency to address problems through rules

of general applicability. *See Fidelity Fed. Sav. & Loan*, 458 U.S. at 163, 102 S.Ct. 3014 ("'all parts of a statute, if possible, are to be given effect'") (*quoting American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 513, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981); *United Air Lines v. Civil Aeronautics Bd.*, 766 F.2d 1107, 1111 (7th Cir.1985) (holding that agency has the authority to issue regulations prohibiting deceptive practices pursuant to its general rulemaking authority and noting in the statute indicates that statutory cease and desist proceedings were intended to be exclusive)).

■ Finally, Plaintiffs contend that the NCUA exceeded the scope of its statutory powers by promulgating a Rule that asserts regulatory authority over non-NCU-SIF insured state credit unions by prohibiting state-chartered corporate credit unions that fail to comply with the Rule from receiving funds from federal credit unions. 59 Fed.Reg. 59,359 (Rec.14). Because the vast majority of credit unions are federally insured and federally-chartered, the Plaintiffs state that the Rule will have the effect of requiring non-NCUSIF insured corporate credit unions to submit to NCUA regulations. Title I of the FCUA, however, specifically provides the NCUA Board with power to directly regulate federal credit unions. Accordingly, the NCUA Board is well within its rights to regulate the federal credit union's lending procedures, despite any ancillary effect such procedures may have on state-chartered credit unions.

■ The Plaintiffs' contend vigorously that the Rule at issue violates the Administrative Procedure Act as it is arbitrary and capricious and because the agency failed to follow the required procedure prior to promulgating the final rule. In evaluating the actions of an administrative agency under the arbitrary and capricious standard, the Court must uphold that agency's action if it "was based on a consideration of the relevant factors" and does not reflect "a clear error of judgment." *Citizens to Pre-*

serve *Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court is not empowered to substitute its judgement for that of the agency. *Id.* at 416, 91 S.Ct. 814; *Virginia Agric. Growers Ass'n v. Donovan,* 774 F.2d 89, 93 (4th Cir.1985).

The NCUA considered all of the relevant factors and determined that further regulation was needed to protect the health of the credit union system. *See* 59 Fed.Reg. at 59,358 (AR 13). The agency noted the abuses that have occurred in the past, citing several specific cases including one which resulted in the NCUA placing a federally-insured corporate in conservatorship. Furthermore, the NCUA relied on the results of a comprehensive study of the credit union system conducted by the General Accounting Office ("GAO"), pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989. Pub.L. No. 101–73, § 1201, 103 Stat. 183, 519 (1989). The GAO report noted the dramatic growth in assets of federally insured credit unions. The Report concluded that the safety and soundness of corporates was essential to the safety and soundness of the credit union industry because the credit unions have a significant financial stake in corporates and the NCUSIF does not insure most credit union deposits in corporates because of limits on coverage and the lack of federal insurance for some corporates. GAO Report at 4 (AR(V)(10) at 2377).

The NCUA also considered the Black Committee report, which was completed by an independent committee which studied corporates and reported in July 1994 that management practices were not keeping pace with the changes occurring as corporates assumed more risk and engaged in more complex transactions. The Black study concluded that interlocking boards might "hinder the prudent management of [a corporate]." The NCUA also found that even the appearance of conflicts could adversely affect confidence in the system. 59 Fed.Reg. at 18,505 (AR 3); 59 Fed.Reg. at 59,358 (AR 13). Additionally, the agency determined that reducing trade association influence would better position corporates to make needed management improvements. 59 Fed.Reg. at 48,833–34 (AR 6–7). Moreover, the agency stated that the changes were required to ensure that credit unions, which constitute the overwhelming majority of corporates' members, have control over corporates. 59 Fed.Reg. at 48, 835 (AR 8); 59 Fed. Reg. at 59, 357 (AR 12); *see also* 59 Fed. Reg. at 59,359 (AR 14) (stating that at least 80% of the members of all corporates except U.S. Central are credit unions).

The record is replete with legitimate reasons for the NCUA's determination that interlocking boards and management create actual conflicts of interest and pose an inherent potential for future conflicts. Given the stakes involved, with federally-insured credit unions possessing assets totalling approximately $289.5 billion [2] , and in light of this nation's recent experience with the savings and loan debacle, the NCUA Board's reasonable determination that such conflicts pose a threat to the safety and soundness of this nation's credit union system is a finding within the NCUA Board's discretion and is entitled to deference.

As to the Plaintiffs' argument that the NCUA failed to follow the procedure for informal rulemaking mandated by the APA, the Fourth Circuit has stated that while the agency's explanation for its rulemaking need not make reference to all of the specific issues raised in the comments, the agency's explanation must "enable a reviewing court to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did." *HLI Lordship Indus. v. Committee for Purchase from Blind and Other Severely Handicapped,*

---

**2.** This figure was estimated as of December 31, 1994. Letter from N. D'Amours, NCUA Board Chairman, to Credit Unions at 1 (March 1995).

791 F.2d 1136, 1140 (4th Cir.1986) (*quoting State of South Carolina ex rel. Tindal v. Block,* 717 F.2d 874, 886 (4th Cir.1983), *cert. denied,* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984)) (quotations omitted). The Plaintiffs argue that the Rule fails this test because the NCUA did not adequately explain why it believed that having officers or directors of insured corporate credit unions serve as unpaid officers or directors of credit union leagues created safety and soundness concerns. The Plaintiffs contend that the NCUA's explanation consisted of merely conclusory assertions that fail to explain why the agency came to that conclusion and exercised its discretion in the given manner. Further, the CUNA Plaintiffs' contend that the NCUA's notice of proposed rulemaking was deficient because it did not contain enough information concerning specific cases under review.

The NCUA did articulate reasons for its concern that interlocking boards threatened the safety and soundness of federally insured credit unions. The NCUA, in its Notice of Proposed Rulemaking, pointed to the dramatic increase in assets held by corporates and noted that associations between corporates and state leagues had in some cases led to the misuse of corporates' funds to advance the financial interests of the leagues. Further, the NCUA relied on the conclusions of the Black Committee Study and the GAO Report, which found that the close relationship between some corporates and trade associations creates inherent conflicts and potential for conflicts. *Id.* 59 Fed.Reg. at 48,833, 48,834 (AR 6, 7).

As to the CUNA Plaintiffs contention that the NCUA's notice of proposed rulemaking was deficient because it did not contain enough information concerning specific cases under review, as the NCUA correctly points out, the information concerning specific cases under review is confidential and the NCUA is under no obligation to disclose such information when promulgating a rule. To take Plaintiffs

argument to its logical extension, the NCUA would never be able to promulgate a rule based on confidential information obtained in its role as examiner without disclosing such information to the public. The APA requires no such result.

The APA states simply that the agency must publish "the terms or substance of the proposed rule or a description of the subjects or issues involved." 5 U.S.C. § 553(b)(3). As the NCUA points out, the purpose of this provision is to afford interested persons a "reasonable opportunity to participate in the rulemaking process." *South Carolina ex rel. Tindal v. Block,* 717 F.2d 874, 883 (4th Cir.1983), *cert. denied,* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984). In the instant action, the NCUA, without disclosing confidential information garnered in connection with its duty as examiner, provided the Plaintiffs with such an opportunity.

Accordingly, this Court finds that the NCUA acted within the scope of its statutory authority in promulgating the Rule at issue in this case and did not violate the dictates of the Administrative Procedure Act in so doing.

An appropriate order shall issue.

### ORDER

This matter came before the Court on cross motions for summary judgment. For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that Plaintiffs motion for summary judgment is denied and Defendant's motion for summary judgment is granted and this case is dismissed.