# Whether the District of Columbia's Clean Air Compliance Fee May Be Collected From the Federal Government

The District of Columbia's Clean Air Compliance Fee is a tax and may not be imposed on the federal government, because the D.C. Council lacks authority to impose taxes on the property of the United States.

January 23, 1996

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
GENERAL SERVICES ADMINISTRATION

This memorandum responds to your request for our opinion on whether the District of Columbia ("District") may collect from the General Services Administration the Clean Air Compliance Fee ("Clean Air Fee" or "Fee") established by a District of Columbia statute, the Clean Air Compliance Fee Act of 1994 ("Act"), D.C. Act 10–387, *reprinted in* 42 D.C. Reg. 86 (1995). [1] As discussed below, we conclude that the District may not collect the Fee with respect to property owned by the United States. The Fee is a tax on such property, and such taxes are beyond the authority of the Council of the District of Columbia ("D.C. Council") under the District of Columbia Self-Government and Governmental Reorganization Act, D.C. Code Ann. §§ 1–201 to 1–299.7 (1992) ("Self-Government Act").

## I.

The following finding in the Act sets forth the D.C. Council's statement of the Act's purpose:

> By requiring payment from employment parking that is not subject to the parking sales and use tax and by allocating the revenues to the transit component of the [District's] Clean Air Regulatory Program the [District] will simultaneously discourage the use of single-occupancy vehicles for home-to-work travel while encouraging the use of car pools and transit, thereby reducing air pollution in compliance with requirements under the Clean Air Act.

Act § 2(5). In its operative provisions, the Act requires owners of real property in the District containing parking spaces that are used for commuting more than

---

[1] In considering this question, we have received the assistance of the Tax and Environment and Natural Resources Divisions of the Department of Justice and we have carefully considered the views submitted by the Office of the Corporation Counsel of the Government of the District of Columbia. *See* Letter for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Garland Pinkston, Jr., Acting Corporation Counsel, Office of the Corporation Counsel (June 19, 1995) ("Corporation Counsel Letter").

two days per week and for which the District's parking sales and use tax is not collected to register the spaces and pay a Clean Air Fee calculated at a rate of $20 per month per space. *Id.* §§ 3–5. Penalties are prescribed for failure by property owners to register employment parking spaces or to pay the Fee. *Id.* § 10. Property owners may seek reimbursement of the Fee from users of the parking spaces. *Id.* § 4(b).

The Act provides that revenues from the Fee "shall be used to defray the cost of the transit component of the [District's] Clean Air Regulatory Program." *Id.* § 11. The Act's legislative history makes it clear that the D.C. Council intended that the proceeds of the Fee would be used exclusively to subsidize mass transit: "The Committee [of the Whole of the D.C. Council] directs that the revenue collected from this fee be used to fund the District's payment to [the Washington Metropolitan Area Transit Authority ("WMATA")] as part of a mass transportation subsidy . . . ." Report to All Councilmembers, from David A. Clarke, Chairman, *Re: Bill 10–610, the "Clean Air Compliance Fee Act of 1994"* at 10 (July 5, 1994) ("Council Report").

The threshold, and ultimately dispositive, question presented here is whether the Clean Air Fee, to the extent it applies to property owned by the United States, is a "tax" or a "fee." This question would necessarily arise in connection with any fee imposed on the federal government by a state or local government, because the federal government is immune from state and local taxation. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819) ("[T]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government."). It has long been established that a state or local government cannot impose a tax upon the United States, its agencies, or its instrumentalities "without a clear congressional mandate." *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 122 (1954).

The "tax or fee" question arises in a unique context here because the federal government has divided the legislative authority for the District between Congress and the D.C. Council. As the District of Columbia Court of Appeals has summarized:

> The United States Constitution vests Congress with the exclusive legislative authority for the District of Columbia. U.S. Const. art. I, § 8, cl. 17. In 1973, Congress passed the Self-Government Act to "relieve Congress of the burden of legislating upon essentially local District matters." D.C. Code 1981, § 1–201(a). Subject to its retention of the ultimate legislative authority over the District of Columbia, Congress delegated certain specific legislative powers to the District of Columbia government. *Id.* . . . In addition [to "expressly reserv[ing] its right 'to exercise its constitutional authority

13

as legislature for the District, by enacting legislation for the District on any subject' "], Congress placed several explicit limitations on the Council's legislative authority.

*District of Columbia v. Greater Washington Cent. Labor Council*, 442 A.2d 110, 113 (1982) (quoting Self-Government Act, § 1–206), *cert. denied*, 460 U.S. 1016 (1983).[2]

As in the cited District of Columbia Court of Appeals case, "[t]he specific limitation[ ] which [is] pertinent to the issue before us [is] enumerated in § 1–233." *Id.* Subsection (a)(1) of § 1–233 provides that "[t]he Council shall have no authority to . . . [i]mpose any tax on property of the United States or any of the several states." Thus, if the Clean Air Fee is a "tax on property of the United States," then the D.C. Council lacked the authority to impose it.[3]

## II.

A tax is an "enforced contribution to provide for the support of government." *United States v. LaFranca*, 282 U.S. 568, 572 (1931). In distinguishing between government taxes and fees, courts have identified two different types of fees: "user or service fees" and "regulatory fees." The D.C. Council imposed the Clean Air Fee on owners of parking spaces in the District and directed that revenues from the Fee be used exclusively to subsidize the mass transit system. For the reasons set forth below, we conclude that the Fee does not qualify as either a "user or service fee" or a "regulatory fee" but is instead an "enforced contribution to provide for the support of government." *Id.*[4]

---

[2] This Office has consistently expressed the same understanding of the limitations on the D.C. Council's authority. For example, in 1976 we opined that the legislative power of the D.C. Council

is subject to careful reservations by the Congress of its own constitutional powers and to specific limitations included in title VI of the Home Rule Act. Indeed, the very grant of power in section 404(a) begins with the words, "[s]ubject to the limitations specified in title VI of this Act, . . ." Thus there are real limits on the Council's authority to act.

The most specific of those title VI limitations are set forth in Section 602 [D.C. Code 1981, § 1–233] of the Home Rule Act.

Memorandum for Hugh M. Durham, Legislative Counsel, Office of Legislative Affairs, from Mary C. Lawton, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: District of Columbia Enrolled Bill B–1–137, the District of Columbia Shop-Book Rule Act* at 2 (Feb. 18, 1976).

[3] The foregoing discussion indicates that principles of federal immunity from local taxation and limitations on the D.C. Council's authority are both implicated by the "tax or fee" question. If the Clean Air Fee is a "tax," then under either principle only Congress could authorize the imposition of the tax on the United States. It is important to recognize, however, that congressional authorization of the District's tax would require two analytically distinct steps, whereas congressional authorization of other state and local taxes requires only one. Congress may waive federal immunity against a properly enacted state or local tax, acting solely in its capacity as legislature for the United States. On the other hand, for Congress to authorize the District's Clean Air Fee, it must both waive federal immunity and either authorize the D.C. Council to impose the tax (acting as legislature for the United States) or impose the tax directly itself (acting as legislature for the District).

[4] In light of this conclusion, there is no need to consider the argument that the Clean Air Fee falls within the scope of the waiver of federal immunity against state and local taxation and regulation set forth in section 118 of the federal Clean Air Act, 42 U.S.C. § 7418. *See* Corporation Counsel Letter at 3–7. For even if the Fee satisfies the terms of that waiver, it may not be imposed on the United States because its enactment was beyond the D.C.

## A.

Central to the analysis of whether a government levy is a user or service fee or instead a tax is whether it is imposed to collect payment for a benefit or service provided by the government to the specific payor as a result of a voluntary act by the payor, or whether instead the payment is viewed as a mandatory contribution for the general support of the government. The clearest Supreme Court guidance on whether an exaction is a tax or a user or service fee is set forth in *National Cable Television Ass'n v. United States*, 415 U.S. 336 (1974). In considering whether a fee imposed by the Federal Communications Commission was a tax and therefore beyond the FCC's authority, the Court opined:

> Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is incident to a voluntary act, *e.g.*, a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society. . . . A "fee" connotes a "benefit" . . . .

*Id.* at 340–41 (footnote omitted).

In *United States v. City of Huntington, W.Va.*, 999 F.2d 71 (4th Cir. 1993), *cert. denied*, 510 U.S. 1109 (1994), the court applied a facts-and-circumstances test to determine whether a so-called "municipal service fee," consisting of a "fire service fee" and a "flood protection fee," imposed upon property owners in Huntington, West Virginia, including federal agencies, was a tax upon the

---

Council's authority under the Self-Government Act. Waivers of immunity apply only to properly enacted state and local measures.

Nor is there a need to ascertain the scope of the Clean Air Act waiver of federal immunity in order to conclude that there is no basis for construing that waiver as an implied repeal of the Self-Government Act's limitation on the authority of the D.C. Council. The District did not make this implied repeal argument in its submission to this Office, *see* Corporation Counsel Letter, but the argument was analyzed in a Congressional Research Service memorandum concerning the Clean Air Fee, *see* Memorandum by George Costello, American Law Division, Congressional Research Service, *Re: Application of District of Columbia "Clean Air Compliance Fee Act" to the Federal Government* at 6–7 (Mar. 24, 1995). We believe the argument has no merit. It is a well-established principle of statutory construction that "repeals by implication are strongly disfavored." *United States v. Fausto*, 484 U.S. 439, 452 (1988). "[A] later statute will not be held to have implicitly repealed an earlier one unless there is a clear repugnancy between the two." *Id.* at 453 (citations omitted). There is no repugnancy between the Self-Government Act and the subsequently enacted section 118 of the Clean Air Act. They address fundamentally different subjects: the latter addresses federal immunity (*i.e.*, the relationship between the federal government and state and local governments), while the former addresses D.C. Council legislative authority (*i.e.*, the relationship between Congress and the D.C. Council). Moreover, neither the text nor the legislative history of Clean Air Act section 118 contain the slightest indication that during its deliberations on waiving federal immunity Congress gave any thought to the legislative authority of the D.C. Council.

United States or was instead a fee for services rendered. The court stated that "[u]ser fees are payments given in return for a government-provided benefit. Taxes, on the other hand, are 'enforced contribution[s] for the support of government.'" *Id.* at 74 (quoting *United States v. LaFranca*, 282 U.S. at 572). The court held that the municipal service fee was "a thinly disguised tax" because the federal agencies' liability for the fee "arises from [their] status as property owners and not from their use of a City service." *Id.*

In *United States v. City of Columbia, Mo.*, 914 F.2d 151 (8th Cir. 1990), the court considered whether a levy charged by a city as part of the price of water and electricity was a tax or a fee. Even though the levy was described in the applicable city ordinance as being in lieu of a tax, the court held that the levy was part of the utility rate and was unlike a tax in many significant respects: it was not contained in a section dealing with the city's taxing power; it was charged to the customer as part of the price of electricity and water; and failure to pay the levy would result in termination of services rather than subject the customer to penalties. As for the levy's application to the federal government, the court said that

> [t]he United States' obligation to pay the [levy arose] only from its consensual purchase of the City's [water and electricity]; it d[id] not arise automatically, as does tax liability, from the United States' status as a property owner, resident, or income earner. When the United States purchases water, electricity, and related services, and then pays the utility bill, it does so as a vendee pursuant to its voluntary, contractual relationship with the City. The City imposes the charge not in its capacity as a sovereign, but as a vendor of goods and services.

*Id.* at 155–56 (citing *National Cable Television*, 415 U.S. at 340–41).

The results in *Columbia* and *Huntington* represent straightforward applications of the Supreme Court's approach in *National Cable Television*. In *Columbia*, the levy was held not to be a tax because the federal agency voluntarily used certain amounts of electricity and water and the levy was for the service actually provided to the agency. In contrast, in *Huntington* the assessment was not based on actual fire and flood services that had been provided on request, but rather represented a charge to property owners for fire and flood protection available to all inhabitants of the city; thus, it was a tax — a mandatory contribution for the support of government services provided to the entire public.

The Clean Air Fee cannot qualify as a user or service fee because the revenue from the Fee is used to provide an undifferentiated benefit to the entire public. The Fee is indistinguishable for present purposes from the assessment to support community-wide services that was held to be a tax in *Huntington*. It is not a

charge for any identifiable District services provided specifically to the owners of parking spaces upon their request. Rather, it is a charge to support the mass transit services the District provides to all inhabitants (permanent and temporary) of the District. Such services, as was the case with the "[f]ire and flood protection and street maintenance [services at issue in *Huntington*,] are core government services" available to all inhabitants of the city. *Huntington*, 999 F.2d at 73.

The court's rationale in *Huntington* is fully applicable here: If the argument that the Clean Air Fee is a user fee rather than a tax were to be accepted, then "virtually all of what now are considered 'taxes' could be transmuted into 'user fees' by the simple expedient of dividing what are generally accepted as taxes into constituent parts, e.g., a 'police fee.'" *Id.* at 74. Taxes imposed on property owners are traditionally used to support government services for the whole community, and the Clean Air Fee is no different.

Moreover, in contrast to the levy held to be a fee in *Columbia*, the United States' obligation to pay the Clean Air Fee does not arise from any consensual purchase of a good or service from the District, but rather arises automatically from its status as a property owner. *See Columbia*, 914 F.2d at 155. The United States is in no respect acting "as a vendee pursuant to its voluntary, contractual relationship with the [District]." *Id.* at 156. In short, the District has "impose[d] the charge . . . in its capacity as a sovereign, [not] as a vendor of goods and services." *Id.* Also in contrast to the *Columbia* fee, the District will enforce the Fee through civil penalties, not the denial of any supposed benefit that the Fee makes possible.

### B.

The case law concerning whether a government levy is a regulatory fee or a tax was summarized by then-Chief Judge Breyer of the First Circuit Court of Appeals in *San Juan Cellular Telephone v. Public Serv. Comm'n*, 967 F.2d 683 (1st Cir. 1992):

> Courts have had to distinguish "taxes" from regulatory "fees" in a variety of statutory contexts. . . . They have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other. The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for exam-

ple, raising money placed in a special fund to help defray the agen-
cy's regulation-related expenses.

Courts facing cases that lie near the middle of this spectrum have
tended . . . to emphasize the revenue's ultimate use, asking wheth-
er it provides a general benefit to the public, of a sort often financed
by a general tax, or whether it provides more narrow benefits to
regulated companies or defrays the agency's costs of regulation.

*Id.* at 685 (citations omitted).

We believe that the Clean Air Fee is considerably closer to being a paradigmatic
tax than a paradigmatic regulatory fee. In Judge Breyer's terms, the Fee "is im-
posed by a legislature [the Council] upon many, or all, citizens [all owners of
employment parking spaces]. It raises money, contributed to a general fund, and
spent for the benefit of the entire community [the account funding the District's
subsidy for mass transit, which is a service available to the entire community]."
*Id.* In other words, the Fee is imposed by a legislative body on property owners
to raise revenue; it is not imposed by a "[regulatory] agency upon those subject
to its regulation." *Id.* Moreover, the fact that the Fee applies only if the District's
sales and use tax has not been imposed already on the parking service for the
vehicle also suggests that the Fee is a tax, because it indicates that the Fee is
intended to complement the parking tax. Indeed, the D.C. Council indicated as
much in its report on the Act when it stated that "[t]he fee will only be imposed
on persons who do not currently pay the District's parking tax." Council Report
at 10.

The District's argument that the Clean Air Fee is a regulatory fee is as follows:

We conclude that the District is required by the Federal Clean
Air Act to reduce, eliminate and control sources of air pollution
and that the monetary exaction imposed by the Clean Air Compli-
ance Fee Act is designed to encourage the use of mass transit and
decrease air pollution associated with automobile traffic. Inasmuch
as the primary purpose of this exaction is the control and abatement
of air pollution, we conclude that this exaction is a "fee" not a
"tax."

Corporation Counsel Letter at 3.

As a threshold matter, it is open to question whether it is correct to view the
Fee's primary purpose as being to regulate air pollution by automobile traffic rath-
er than to raise revenue for mass transit that benefits the general public. The fact
that the proceeds of the Fee are to be allocated entirely to support the mass transit
system strongly suggests that the primary purpose of the Fee is to raise revenue
to support government operations. *See* Act § 11; Council Report at 10. In addition,
although discouraging the use of automobiles for commuting no doubt does serve

air pollution regulatory purposes, the actual reduction in automobile commuting that can be expected here, as a result of the imposition of the Fee, is indirect and speculative compared to the direct and immediate revenue impact and support for mass transit that will result.[5]

In any event, even assuming that the Clean Air Fee falls in the middle of the fee-tax spectrum, following Judge Breyer's focus on the revenue's ultimate use leads to the conclusion that this exaction is a tax. To accept the District's characterization would require that we conclude either that subsidizing mass transit is a regulation-related cost of the District's air pollution regulatory program or that the assumed regulatory impact of the Fee on air pollution (as a result of reduced automobile commuting and increased use of mass transit) is sufficient by itself to render it a regulatory fee notwithstanding the remaining aspects of the Fee that all suggest it is a tax. With respect to the first of these alternatives, while we do not doubt that encouraging the use of mass transit can have a beneficial effect on air pollution, the costs of a separate, non-regulatory government program that benefits the public as a whole are not the kind of costs that courts have viewed as defrayable by regulatory fees. *See supra* pp. 17–19. The subsidization of mass transit is not a regulatory cost, but rather a general government expense typically defrayed by taxes: subsidization of mass transit "provides a general benefit to the public, of a sort often financed by a general tax." *San Juan Cellular Telephone*, 967 F.2d at 685.

As for the second alternative, the simple response is that ascribing a regulatory purpose to a tax does not mean that it is not a tax. Taxes often have a significant regulatory purpose: "[A] tax is a powerful regulatory device; a legislature can discourage or eliminate a particular activity that is within its regulatory jurisdiction simply by imposing a heavy tax on its exercise." *Massachusetts v. United States*, 435 U.S. 444, 455–56 (1978). *See also National Cable Television Ass'n v. United States*, 415 U.S. 336, 341 (1974) ("The lawmaker may, in light of the 'public policy or interest served,' make the assessment heavy if the lawmaker wants to discourage the activity; or it may make the levy slight if a bounty is to be bestowed . . . . Such assessments are in the nature of 'taxes' . . . ."). Thus, the fact that discouraging automobile commuting is one of the stated reasons for the Clean Air Fee does not convert it from a tax into a regulatory fee when its revenue-raising purpose in support of separate, non-regulatory government operations is so direct and substantial. The foregoing analysis is supported by the decision

---

[5] *See, e.g.*, Statement of Art Lawson, Administrator, Office of Mass Transit, Department of Public Works, Before the Council of the District of Columbia Committee of the Whole at 1–2 (May 18, 1994). ("Although these measures will not on their own result in measurable reductions of automobile use within the District of Columbia it is the direction setting that is most important here. Additionally, these measures are important because they will generate desperately needed revenues to help fund the District's FY 1994 and 1995 WMATA operating budget. . . . [T]he District's subsidy to support WMATA was reduced by $7.2 million in the current budget year. This reduction left WMATA underfunded by approximately $7 million. The Committee on Regional Authorities proposed to make up the $7 million by implementing a series of transfer charges and fare increases on District Metrobus service. . . . [Councilwoman Mason] has proposed that the revenue from these bills be used to fund the WMATA deficits thereby making the fare and transfer charge proposals unnecessary."). *See also id.* at 6.

in *San Juan Cellular Telephone* and the cases cited in Judge Breyer's opinion in that case. In *San Juan*, the court held that a three percent of gross revenues charge imposed on a telephone company by the Puerto Rico Public Service Commission as a condition of the company's authorization to provide cellular telephone service was a regulatory fee. Judge Breyer stressed that the fee was assessed by a regulatory agency, was placed in a special fund, and was not to be used for a general purpose but rather to defray specific costs of regulation (investigative expenses, hiring of services, and acquisition of equipment). 967 F.2d at 686. His opinion distinguished the case before the court, as well as other cited examples of regulatory fees, [6] from those cases that had held charges to be taxes because the proceeds from the charges were used for general purposes or to raise general revenue. [7]

*Schneider Transport, Inc. v. Cattanach* is particularly instructive for our purposes. In that case, it was argued that truck registration fees imposed on trucking companies were "regulatory licensing fees." The Seventh Circuit rejected this argument, finding that "[a]lthough not denominated as such, the registration fees are imposed for revenue-raising purposes, a characteristic of any tax . . . [, and] [t]he fees are deposited in a segregated fund, the state transportation fund, for transportation purposes, including highway construction." 657 F.2d at 132 (citations omitted). Thus, as with the Clean Air Fee, the charge went beyond regulatory purposes and raised revenue to support a separate, non-regulatory government program.

Finally, we observe that our conclusion that the Clean Air Fee is not a regulatory fee does not conflict with Judge Breyer's statement that a regulatory fee "may serve regulatory purposes [by] deliberately discouraging particular conduct by making it more expensive." 967 F.2d at 685. The fact that some bona fide regulatory fees serve regulatory purposes in this way does not mean, of course, that every charge with a regulatory purpose that raises revenue beyond what would defray regulatory costs must be viewed as a fee rather than a tax. As discussed above, *supra* p. 19, taxes often have regulatory purposes. *See Massachusetts v. United States*, 435 U.S. at 455–56; *National Cable Television Ass'n v. United States*, 415 U.S. at 341.

Judge Breyer cited only one case involving this type of regulatory fee. 967 F.2d at 685 (citing *South Carolina ex rel. Tindal v. Block*, 717 F.2d 874 (4th Cir. 1983), *cert. denied*, 465 U.S. 1080 (1984)). *Block* concerned a charge imposed

---

[6] *See, e.g., Union Pac. R.R. v. Public Util. Comm'n*, 899 F.2d 854, 856 (9th Cir. 1990) (assessment helped defray utility commission's "cost of performing [its] regulatory duties"); *Mississippi Power & Light Co. v. United States Nuclear Regulatory Comm'n*, 601 F.2d 223 (5th Cir. 1979), *cert. denied*, 444 U.S. 1102 (1980) (NRC charge helped pay costs of environmental reviews, hearings, and administrative and technical support).

[7] *See id.* at 685 (citing *Schneider Transport, Inc. v. Cattanach*, 657 F.2d 128 (7th Cir. 1981) (charge on truckowners used to pay for highway construction), *cert. denied*, 455 U.S. 909 (1982); *Keleher v. New England Tel. & Tel. Co.*, 947 F.2d 547 (2d Cir. 1991) (public utility companies using city streets charged fee tied to utility's gross revenues and not cost of regulating utility's use of city streets), *Robinson Protective Alarm Co. v. City of Philadelphia*, 581 F.2d 371, 376 (3d Cir. 1978) (charges on central alarm companies based on gross revenues and "added to the public fisc, rather than applied exclusively to contractual services owed" to the companies)).

by the Secretary of Agriculture on the proceeds of all milk sold commercially.
The charge was remitted to the Commodity Credit Corporation ("CCC") as part
of a milk price support program administered for the Secretary by the CCC. The
purposes of the charge were "to encourage dairy farmers to reduce milk produc-
tion and to offset a portion of the cost of the milk price support program." 717
F.2d at 876. Although *Block* principally concerned Administrative Procedure Act
challenges to the Secretary's imposition of the charge on milk sales, the court's
opinion also briefly discussed the allegation that the Secretary's charge was a
tax and therefore was unconstitutional for two reasons: it did not originate in the
House of Representatives, and Congress cannot delegate its authority to tax. The
court easily concluded that the charge was not a tax because it was authorized
by Congress pursuant to its commerce power rather than taxing power, citing
*Wickard v. Filburn*, 317 U.S. 111 (1942), for the proposition that "[t]he imposi-
tion of assessments have long been held to be a legitimate means of regulating
commerce." 717 F.2d at 887. [8]

*Block* does not support the position that the Clean Air Fee is a regulatory fee,
because the charge addressed in that case differed from the Fee in two funda-
mental respects: it was imposed on regulated parties, not property owners, and,
most significantly, the revenue raised from the charge was used only for the spe-
cific regulatory program of which it was a part, and to which the regulated parties
were subject, not to support government operations in a separate, non-regulatory
program that benefits the public generally.

## C.

The "tax or fee" cases cited by the Office of the Corporation Counsel, *see*
Corporation Counsel Letter at 2, included both user or service fee cases and regu-
latory fee cases. The cited cases are consistent with our conclusion that the Clean
Air Fee is a tax and not a fee. For example, in *Valandra v. Viedt*, 259 N.W.2d
510 (S.D. 1977), the court held that a "mobile home license fee" was principally
a tax because "85% of the fee collected [allocated to the county highway and
bridge fund] is for revenue purposes and bears no relationship to the cost of ad-
ministering the [mobile home] registration system," and only the fifteen percent
allocated "to defray costs of titling, registration and for unusual use of the high-
way" was arguably a fee. *Id.* at 512. Similarly, the Clean Air Fee is allocated
to support a mass transit system and is not tied to any governmental service or

---

[8] The two cases cited in this regard by the *Block* court each held that administrative sanctions imposed against
farmers for exceeding marketing quotas were authorized under the commerce power and did not constitute taxes.
*See United States v. Stangland*, 242 F.2d 843, 848 (7th Cir. 1957); *Rodgers v. United States*, 138 F.2d 992, 994
(6th Cir. 1943). The central rationale of the cases was that the charge in question "[was] not a charge on property
for the purpose of raising revenue. Revenue may incidentally arise therefrom, but that fact does not divest the regula-
tion of its commerce character and render it an exercise of the taxing power." *Rodgers*, 138 F.2d at 995. In contrast,
the Clean Air Fee's production of revenue to subsidize mass transit is anything but incidental: the Fee is a charge
on property for the purpose of raising revenue.

benefit specifically provided to owners of parking spaces. *See also Radio Common Carriers v. State*, 601 N.Y.S.2d 513, 516 (N.Y. 1993) ("Section 1150 . . . is in effect a tax. The monthly one dollar fee is not related to licensing or other services performed for the [fee-payor] by the state . . . . The money collected is added to the general state fisc . . . .").

Those of the cases cited by the Corporation Counsel that held that the charge in question was a fee generally differ from the present case in the critical respect that they involved payments to defray costs attributable to regulated parties. For example, in holding that a ten dollar criminal history records check charge paid by potential firearms buyers was a fee, the court in *In re Shooters Emporium, Inc.*, 135 B.R. 701 (Bnkr. S.D. Fla. 1992), stated that

> the nature of the payment is voluntary. Payment is required only if one desires to purchase a firearm. The purpose of the payment is for private benefit. Only people who pay the fee may purchase a firearm. Furthermore, this payment is clearly designed to recoup the costs of regulation from the people regulated, rather than to raise general revenues. This payment can not be reasonably construed to be an involuntary exaction for a public purpose.

*Id.* at 702–03.[9] In contrast to these cases, the Act makes clear that the Clean Air Fee is allocated to support mass transit; it does not defray costs attributable to parking space owners or any other regulated parties.

## III.

For the reasons set forth above, we conclude that the Clean Air Fee is a tax. To the extent that the Fee is imposed on property owned by the United States, it is a "tax on property of the United States" and therefore beyond the authority of the D.C. Council under the Self-Government Act. The District may not collect the Fee from the federal government.

TERESA WYNN ROSEBOROUGH
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[9] *See also City of Vanceburg, Ky. v. Federal Energy Regulatory Comm'n*, 571 F.2d 630, 644 (D.C. Cir. 1977) (dam-use charges are "exacted against a licensee in exchange for a privilege which the licensee has requested or applied for and from which the licensee derives a special benefit"), *cert. denied*, 439 U.S. 818 (1978); *Strater v. Town of York*, 541 A.2d 938 (Me. 1988) (ten dollar charge for harbor usage); *Memphis Retail Liquor Dealers' Ass'n v. City of Memphis*, 547 S.W.2d 244 (Tenn. 1977) (emphasizing uniqueness of regulation of alcoholic beverage industry and common practice of regulating that industry through license taxes, holding that five percent inspection fee imposed on retailers was a fee even though it produced revenues that were 200 times the cost of regulation).